[S. F. No. 21901.   In Bank.   Mar. 1, 1965.]

CONSTANCE JACKSON, Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; THE PEOPLE, Real Party in Interest.

Garry, Dreyfus & McTernan, Charles R. Garry, Donald L. A. Kerson and Benjamin Dreyfus for Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Robert R. Granucci, Edward P. O'Brien and James Murad, Deputy Attorneys General, for Real Party in Interest.

MOSK, J.—Petitioner seeks a writ of prohibition restraining the San Francisco Superior Court from taking any further action on an indictment charging her with murder. (Pen. Code, § 187.)

Petitioner contends that she was indicted without reasonable or probable cause (Pen. Code, § 995) in that the prosecution assertedly failed to produce any evidence at the grand jury hearing to show ''malice aforethought,'' and that the evidence which it did produce established as a matter of law either adequate circumstances of mitigation or a degree of intoxication sufficient to render petitioner incapable of possessing such malice. After consideration of the evidence in the light of the limited purpose of this proceeding in prohibition, we have concluded that it fails to support petitioner's contentions and hence the peremptory writ must be denied.

There was evidence before the grand jury of the following principal facts: the victim, Harry Cole, was a mutual acquaintance of petitioner and her boyfriend, Frank Darden. At approximately 7:30 p.m. on August 2, 1964, Cole called on petitioner at her home, bringing with him a fifth of vodka and some mix. Shortly after Cole's arrival petitioner telephoned Darden and invited him over, incidentally mentioning that Cole was there. Darden declined the invitation, saying that he wanted to rest for a while but would come over later. For the next two hours petitioner, clad in pajamas and a robe, entertained Cole in her bedroom, talking and consuming several drinks of vodka. According to petitioner's subsequent explanation to the police, in the course of the conversation Cole "made several suggestions to her regarding her relationship with Mr. Darden and how she was wasting her time with him and that he [Cole] should be her boyfriend, and what he could do with her sexually and, roughly, he wanted to take her to bed." At no time, however, did Cole make any physical advances towards her. Petitioner thereafter asked Cole to leave, and he did so. Between 9:30 and 10 p.m. petitioner telephoned Darden a second time to ask him when he was coming over, and told him that Cole had left. Petitioner also conversed with Darden's mother, and it was agreed that Darden would bring some dinner with him.

About 10:15 p.m. two witnesses observed Cole standing outside petitioner's house in front of an open window; two shots were fired, and Cole walked over to the front door. Petitioner opened the door, Cole entered, and two or three more shots were fired in rapid succession. Describing these events to the police, petitioner "stated that she fired some warning shots up high, I guess to the ceiling through the window, and then she said she didn't hear anything; she became frightened, that she may have heard [hurt?] someone, and she opened the door and that's when the deceased, she said, forced his way into the house, and he was coming at her so she fired at him point blank." Petitioner then telephoned Darden again and said, "Can you come out quick? . . . I think I've killed Harry [Cole]." The victim was found dead, lying face down approximately 10 feet inside the front door. The autopsy surgeon testified that Cole had been shot twice at close range: the fatal bullet had entered the left temporal area of the skull, passed through the brain, and exited through the back of the head; a second bullet had entered the right shoulder and lodged in the victim's back.

The gun was identified as a .32 caliber automatic owned by petitioner.

The governing principles in this proceeding are well known, and were recently restated by us in *People* v. *Ketchel* (1963) 59 Cal.2d 503, 532 [30 Cal.Rptr. 538, 381 P.2d 394] : " 'Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citation.]

An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' [Citations.] 'If there is some evidence to support the indictment, the courts will not inquire into its sufficiency. . . .' [Citations.] [Italics deleted.]''

From the foregoing evidence the grand jury could reasonably entertain, as men of ordinary caution and prudence, a strong suspicion that petitioner shot and killed Harry Cole on the night in question. Indeed, petitioner apparently concedes this to be the fact, but argues that an indictment for murder nevertheless cannot stand because ''There was no evidence before the grand jury that the homicide was committed with malice aforethought.'' By statutory definition (Pen. Code, § 187) such malice ''is made an essential element of the crime of murder whether it be of the first degree or of the *second* degree.'' (*People* v. *Bender* (1945) 27 Cal.2d 164, 180 [163 P.2d 8].) To sustain a conviction of either degree of murder, therefore, it must be proved at the trial that the homicide was committed by the accused with the state of mind known in the law as ''malice aforethought.'' But it does not follow that the same showing must be made before the grand jury to support a mere accusation of murder.

To begin with, even at trial the necessary element of malice may be inferred from the circumstances of the homicide. Penal Code section 188 declares that ''Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. *It is implied, when no considerable provocation appears,* or when the circumstances attending the killing show an abandoned and malignant heart.'' (Italics added.) From the emphasized language the rule is derived that ''When the killing is proved to have been committed by the defendant, and nothing further is shown, *the presumption of law is that it was malicious and an act of murder*; but in such a case the verdict should be murder of

the second degree, and not murder of the first degree." (Italics added.) (*People* v. *Craig* (1957) 49 Cal.2d 313, 319 [316 P.2d 947], quoting from *People* v. *Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; accord, *People* v. *Terry* (1962) 57 Cal.2d 538, 556 [21 Cal.Rptr. 185, 370 P.2d 985]; *People* v. *Cole* (1956) 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Bender* (1945) *supra,* 27 Cal.2d 164, 179.) ▮ A further refinement of that rule has been developed in cases where the homicide results from an assault with a deadly weapon: "When it is proved that defendant assaulted decedent with a dangerous weapon in a manner endangering life and resulting in death and the jury concludes that the evidence did not create in their minds a reasonable doubt whether defendant's act may have been justified or its criminal character mitigated by the influence of passion (e.g., of terror, *People* v. *Logan,* 175 Cal. 45, 48, 49 [164 P. 1121]) then no further proof of malice or of intent to kill is required to support a verdict of guilty of second degree murder. Of that crime an actual intent to kill is not a necessary component and malice is implied from such assault in the absence of justifying or mitigating circumstances." (*People* v. *Torres* (1949) 94 Cal.App.2d 146, 149-150 [210 P.2d 324]; accord, *People* v. *Isby* (1947) 30 Cal.2d 879, 889 [186 P.2d 405]; *People* v. *McAuliffe* (1957) 154 Cal.App.2d 332, 338 [316 P.2d 381]; *People* v. *Butterfield* (1940) 40 Cal.App.2d 725, 729 [105 P.2d 628].)

▮ These rules of substantive law are implemented by Penal Code section 1105, which provides that "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." It is true that this statute "does not place on a defendant the burden of persuasion, but merely declares a rule of procedure that imposes on him a duty of going forward with evidence of mitigating circumstances." (*People* v. *Deloney* (1953) 41 Cal.2d 832, 841 [264 P.2d 532].) Yet by the same token if the defendant fails to discharge the latter duty to the point of raising a reasonable doubt in the minds of the jurors, the presumption of malice will operate and the homicide will be deemed "malicious and an act of murder." (*People* v. *Craig* (1957) *supra,* 49 Cal.2d 313, 319; see also *People* v. *Hall* (1963) 212 Cal. App.2d 480, 482 [28 Cal.Rptr. 164], and cases cited.)

It follows that to require the prosecution, as petitioner urges, to present specific proof of "malice aforethought" at the grand jury hearing, over and above its fundamental showing of the killing of the victim by the defendant, would in effect place a greater burden on the prosecution at the accusatory stage than at the trial itself. None of petitioner's arguments compels us to reach such an anomalous result. First, petitioner invokes those cases where an indictment or information has been set aside because of a total lack of evidence before the grand jury or magistrate of one of the necessary elements of the crime charged. See, e.g., *Garabedian* v. *Superior Court* (1963) 59 Cal.2d 124, 127 [28 Cal.Rptr. 318, 378 P.2d 590] (leaving the scene of an automobile accident); *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459, 463-465 [15 Cal.Rptr. 65, 364 P.2d 241] (kidnaping); *Callan* v. *Superior Court* (1962) 204 Cal.App.2d 652, 662 [22 Cal. Rptr. 508] (conspiracy to commit grand theft); *Whitlock* v. *Superior Court* (1950) 97 Cal.App.2d 26 [217 P.2d 158] (felony drunk driving); *In re Jang* (1938) 25 Cal.App.2d 529 [78 P.2d 250] (bribery).) But in no case so holding was the missing element one which, as here, arose by implication of law from the nature of the criminal act itself. By contrast, accusations of murder have been upheld in a number of cases without specific evidence of malice, upon a showing of the fact of the homicide and the accused's participation in it.

In *People* v. *Nagle* (1944) 25 Cal.2d 216 [153 P.2d 344], the evidence adduced at the preliminary examination showed that the deceased, a taxicab driver, was shot by the defendants in the act of ousting him from his vehicle for the purpose of commandeering it to use in a robbery; there was no evidence specifically establishing that the defendants entertained malice towards that particular driver, who had been engaged by mere chance. Yet the defendants were bound over to answer to a charge of murder, and we held that the committing magistrate "had no alternative" but to do so on that evidence. (*Id.* at p. 222.)

Similarly, in *In re Kawaguchi* (1910) 12 Cal.App. 498, 499 [107 P. 727], the testimony before the committing magistrate showed only that the petitioner had been drinking at a boardinghouse with the deceased and two other companions on the day of the crime, and "at that time they were all apparently on friendly terms with each other"; the four left the boardinghouse together, but the deceased did not return with the others and was found dead of knife and gun-

shot wounds. Petitioner and his companions were charged with murder, and the appellate court held that "obviously" the facts before the magistrate "are sufficient to support the order of commitment."

The same result has been reached even where no firearm or knife was used in the killing. In *In re Plummer* (1947) 79 Cal.App.2d 651, 655 [180 P.2d 771], the evidence at the preliminary examination showed that the petitioner and a companion were approached by one George Erickson, apparently a total stranger, who "made some gestures that indicated that Erickson was on the queer side"; a fistfight ensued in which Erickson received blows causing fatal hemorrhaging of the brain. Again there was no evidence specifically directed to the question of malice, yet the petitioner was charged with murder and the appellate court had no difficulty in holding that there was reasonable cause to do so.

Petitioner's second argument is that malice cannot be implied in this case because the evidence before the grand jury assertedly establishes *as a matter of law* either justifiable killing in self-defense or at least provocation adequate to reduce the crime to voluntary manslaughter. (Pen. Code, §§ 192, 197.) As an abstract proposition, it is of course conceivable that a case of homicide could be presented to the grand jury in which evidence of adequate provocation or self-defense were both uncontradicted and sufficient as a matter of law; in that event it could reasonably be contended that an indictment for murder would be in excess of the grand jury's power. But this is not such a case. Here petitioner's theory is that the killing was "provoked by the decedent's persistent and clearly-demonstrated determination to commit a sexual assault" upon her, and she naturally emphasizes those aspects of the evidence which support her theory. That evidence, however, is neither uncontradicted nor susceptible of only one interpretation.

Thus the Attorney General takes the position that no compelling circumstances of mitigation are shown, and that if Cole's intent was to sexually assault petitioner it was not "persistent and clearly-demonstrated." To begin with, there is said to be a conflict in the testimony concerning petitioner's alleged expressions of fear of Cole: according to petitioner's reported statement to the police, she complained to Darden on the telephone that Cole was "getting out of line" and Darden advised her to "Talk him out of the place"; that Cole suddenly left while she was talking with Darden; and

that five minutes later ''she was still on the phone, and some-body was attempting to knock at the door and attempting to get in the window just after that, and she became a little excited and asked Mr. Darden to come right over, and she said that she kept telling the party to go away and 'Harry, what are you doing? Get out.' And she said she became very excited and [after hanging up the telephone] she went back and got the gun in her bedroom.'' Darden, however, denied on the witness stand that petitioner at any time that evening complained to him on the telephone about Cole's conduct. He recounted no such incident as petitioner's becoming excited or fearful at the sound of someone at her window, but rather testified to a normal conversation concluded by her discussion with his mother about dinner.

At least some of these discrepancies may be attributable to the fact that the contents of petitioner's statement were made known to the grand jury through the mouth of another. Yet even if that version of the events be accepted in its entirety, argues the Attorney General, to establish adequate provocation it is also necessary to believe that upon seeing at her window and then opening her door to a man with whom she had just spent a companionable two hours of drinking in her bedroom—during which time he had made no physical advances whatever—petitioner suddenly conceived a fear that he was about to do her some great bodily harm; and to estab-lish justifiable homicide in self-defense it is necessary to further believe, as required by statute, that such circumstances would have been ''sufficient to excite the fears of a reasonable person'' and that petitioner ''acted under the influence of such fears alone'' (Pen. Code, § 198).

We need not resolve any such conflicts or questions of credibility at this time, however, for these issues are pecu-liarly within the province of the trier of fact. (*People* v. *Wells* (1938) 10 Cal.2d 610, 620-624 [76 P.2d 493]; *People* v. *Davis* (1962) 203 Cal.App.2d 18, 20 [21 Cal.Rptr. 155]; *People* v. *McAuliffe* (1957) *supra,* 154 Cal.App.2d 332, 340; *People* v. *Torres* (1949) *supra,* 94 Cal.App.2d 146, 149.) In the first instance that responsibility is placed on the grand jury, and its discretion is commensurately broad. (See, e.g., *People* v. *McGee* (1947) 31 Cal.2d 229, 233-234 [187 P.2d 706], where we held that although the committing magistrate was amply justified in determining that the evidence before him ''showed the public offense to be manslaughter rather than murder he would also have been warranted, on a different

view of the same evidence, in concluding that the offense was murder of the second degree.'') ▮ In the present proceeding our function in appraising such evidence is a limited one: we may not substitute our judgment for that of the grand jury as to the weight of the evidence, and every legitimate inference that may be deduced therefrom must be drawn in favor of the indictment. (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55 [216 P.2d 859]; *People* v. *Cron* (1962) 207 Cal.App.2d 452, 457 [24 Cal.Rptr. 587].) ▮ Viewed in the light of these rules we cannot say that the evidence compelled the grand jury, as a matter of law, to find that the homicide was committed either in self-defense or under provocation adequate to reduce it to manslaughter.

In a not dissimilar case the evidence at the preliminary examination showed that the defendant and one Charlie Thomas, participants in a dice game with fellow farmworkers, began to argue over who had won a side bet between them; Thomas picked up the disputed money and left by a side door, followed shortly afterwards by the defendant; Thomas was waiting outside and when the defendant again demanded his money Thomas struck him on the head with a beer bottle, inflicting a bloody scalp wound; as the defendant staggered back and reached down to pick up his cap, he heard someone shout ''Look out!'' and saw Thomas bearing down on him with a knife; in the struggle that ensued the defendant's hand was slashed but he managed to seize the knife and strike Thomas in the neck, killing him; after his wounds were dressed the defendant retired to his quarters to await the arrival of the police. On these facts the defendant was held to answer to a charge of murder. In a first challenge (*People* v. *James* (1950) 99 Cal.App.2d 476, 484 [222 P.2d 117]) the District Court of Appeal ruled that ''From an examination of the testimony taken at the preliminary examination, we conclude that there was probable cause to hold the defendant to answer under the rule stated in *People* v. *McRae*, 31 Cal.2d 184, 187 [187 P.2d 741],'' i.e., that a magistrate ''may commit a defendant, even though there may be doubt as to his guilt.'' In a subsequent proceeding in habeas corpus we set aside the defendant's guilty plea for violation of his constitutional right to counsel, but further held that the evidence at the preliminary examination ''was sufficient to justify the committing magistrate's concluding that a public offense had been

committed and that there was reasonable cause to hold [defendant] for trial. (Pen. Code, § 872; *People* v. *McGee,* 31 Cal.2d 229, 234 [187 P.2d 706]; *People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].) The denial of [defendant's] right to counsel did not serve to acquit him of the offense charged, and he is still subject to trial.'' (*In re James* (1952) 38 Cal.2d 302, 313-314 [240 P.2d 596].) Certainly the evidence of provocation or self-defense in the case at bar is no more compelling than in *James,* where the defendant was left with the scars of the violent attack upon him by the decedent.

For like reasons we cannot say that the grand jury was compelled as a matter of law to find that by reason of intoxication petitioner was wholly incapable of forming or harboring the requisite ''malice aforethought.'' The evidence on this issue is meager indeed: the jury was told of the so-called ''legal'' interpretation of intoxication in terms of the blood alcohol level; the autopsy surgeon testified to the rate that the ''average'' person metabolizes blood alcohol, adding that it is ''not the same in every individual''; and the police witness reported that petitioner's blood alcohol level was 0.19 per cent when tested ''somewhere between an hour and a half to two hours and a half'' after the shooting. On the other hand, Darden testified that on neither of the two occasions when petitioner telephoned him in the course of the evening but before the homicide did it sound to him from her conversation that she had been drinking. Such conflict and uncertainty cannot be resolved in this extraordinary proceeding, but are questions to be argued to and determined by the trier of fact. (Pen. Code, § 22; *People* v. *Isby* (1947) *supra,* 30 Cal.2d 879, 890; *People* v. *Wilson* (1958) 160 Cal.App.2d 606, 608 [325 P.2d 106].)

In conclusion, it must be emphasized that in declining to interfere with the trial process on the facts here shown we hold only that petitioner's challenge to their sufficiency is premature. We express no opinion at this time on the merits of the evidence of provocation, self-defense, or intoxication, and nothing we have said should be taken as foreclosing petitioner from placing this or further evidence before the trier of fact at the proper opportunity.

The alternative writ heretofore issued is discharged and the peremptory writ is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.