[Crim. No. 14511.   Second Dist., Div. One.   Sept. 4, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MURIEL RITA WEISBERG, Defendant and Appellant.

Max Solomon and Robert A. Doyle for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas E. Warriner, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of murder in the second degree.

In an information filed in Los Angeles on May 12, 1966, Muriel Weisberg was charged with murdering David Weisberg on April 19, 1966. Defendant pleaded not guilty and in a nonjury trial defendant was found guilty of murder of the second degree. Defendant was sentenced to the state prison. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: Gerald Weisberg and defendant Muriel Rita Weisberg were husband and wife during the events with which we are concerned. Two children were born as the issue of the marriage, namely Sharon, a girl, born on November 11, 1964, and David born on March 1, 1966. Defendant Rita had the care of the two children. David died on April 19, 1966, at about 10:25 a.m. in a local hospital. An autopsy disclosed that death resulted from a massive intra-cranial hemorrhage, caused by two skull fractures. The fractures caused contusion of the brain and the lacerating of the blood vessels in the brain. David was about seven weeks old at the time of death.

A neighbor, Mrs. Slocum, testified that she observed a bruise on David in March of 1966 and that defendant had told her that David had received the bruise by striking his head on the side of the crib. Sharon had a broken leg and defendant told Mrs. Slocum that the break occurred when Sharon got her leg caught in the crib. Further defendant told Mrs. Slocum that Mr. Weisberg had to get a part-time job "because of that little bitch" meaning and referring to Sharon.

Mrs. Banker visited the Weisberg home and saw David and noticed a bruise on his eye, forehead and down to the back of his ear which was black and blue and swollen. Red blotches appeared throughout the bruised area. Defendant told Mrs. Banker that David had bumped his head on the crib, that she, defendant, had called a doctor who was caring for the child. Defendant told Mrs. Banker that Sharon had broken her leg apparently by becoming entangled in the slats of her crib.

Mrs. Turney was told by defendant that she, defendant, had beaten Sharon when she was five months old until Sharon was red. On one occasion Mrs. Turney found Sharon lying in her own vomit and defendant stated that she, defendant, was not going to pick up Sharon because she was just throwing a tantrum. Defendant also told Mrs. Turney that Sharon had broken her leg by falling in her crib and further that in one

instance Sharon had to go to a hospital because she, defendant, had given her too much sedative.

Dr. Gwinn, a specialist, examined X-rays of decedent's skull and concluded that an infant of the age of David could not have inflicted such injuries upon himself. The doctor also noted a chip fracture in an X-ray picture of decedent's leg and stated that such was not the sort of injury which a 7-week-old child could inflict upon himself—further that the fracture had occurred three or four weeks before the skull-fracture. Further the doctor stated that David had suffered fractures of the 5th, 6th, 7th, and 8th ribs back near the spine, that these fractures were the result of an externally applied force and that a 7-week-old child could not have inflicted the injuries upon himself. The doctor also stated in effect that he believed that a child of the age of Sharon would be unable to cause a fracture of her own leg.

Dr. Kade, a senior deputy medical examiner, performed an autopsy upon David and it was the doctor's opinion that death resulted from the fractured skull, that the child could not have inflicted the injuries upon himself while in a crib, that the rib cage fractures were not self-inflicted and that the injuries to the eye and forehead could have taken place at the same time as the fatal skull fractures occurred.

Dr. Burschinger, an orthopaedic specialist, treated Sharon for her broken leg. Defendant told the doctor that Sharon had caught her leg in the crib. The doctor stated that it would be very unusual for a child of the age of three months to inflict that type of injury upon herself.

Dr. Rappoport examined Sharon and discovered the fracture in her leg. He was of the belief that it was most unlikely that the break was self-inflicted. The doctor was called to the emergency room to attend David and he, the doctor, suspected that David had suffered brain damage and he asked defendant whether David had been beaten or dropped. Defendant denied to the doctor that either had occurred and she did not tell the doctor that she had fallen with the child on the previous Friday. The doctor was also of the belief that rib injuries were of traumatic origin. The diagnosis was ''Battered-child syndrome'' based in part upon ''the combination of old and new fractures in a small infant, with an inadequate history to explain it.''

Dr. Clark, a radiologist, examined X-ray pictures of Sharon and noted that there was an oblique fracture of the right femur and a chip fracture of the left knee which had partly

healed and that the chip fracture resulted from a trauma which had occurred at least two weeks before the femur fracture.

Officer Elliott testified that defendant had told him that David had caused the bruising on his head by pushing himself against the slats of the crib.

Mr. Weisberg testified that his wife, defendant, had told him that David received the bruise around the eye as a result of his moving against the crib.

Appellant now asserts that it was error to permit testimony as to injuries to Sharon and that there is no evidence of malice upon her part.

■ Appellant makes repeated reference to what is contained in the transcript of the preliminary hearing. That record is not before this court and the reporter's transcript of the trial gives no indication that the preliminary transcript was before the trial court excepting for a limited impeachment purpose.

Clearly the evidence in this case was properly admitted. The evidence shows at the very least a peculiar behavior pattern by appellant and tends to identify her, the perpetrator of earlier crimes, as the person who perpetrated the crime charged. (See Witkin, Cal. Evidence (2d ed. 1966), § 347, p. 307.) ■ As stated in *People* v. *Bufarale,* 193 Cal.App.2d 551, 558-559 [14 Cal.Rptr. 381] : ''Evidence of a defendant's prior misconduct may be admissible where it tends to show that he is guilty of the crime charged 'by showing a peculiar or characteristic behavior pattern' manifested by his conduct in both instances. [Citation.] The evidence in question meets these requirements.

''EVIDENCE RE MENTAL AND EMOTIONAL BACKGROUND

''The defendant's eldest sister was called as a witness on his behalf; testified that his father ordered him to leave home after the death of his mother in 1954; and was asked to describe the relationship between the defendant and his mother, but an objection to the admission of such evidence was sustained on the ground that it was too remote. In a discussion which followed, the trial court judge said :

'' 'I will permit you to introduce as part of the history taken by the expert witnesses anything that they deemed important. To leave it to a lay jury and a lay witness as to his action years and years ago, the objection is sustained.' ''

And also see *People* v. *York,* 242 Cal.App.2d 560, 568 [51 Cal.Rptr. 661], where it is stated : ''Evidence of prior assaults is admissible to prove material elements of the current offense.

[Citations.] The evidence was clearly relevant as tending to show guilty intent and to rebut any claim that the child's injuries were inflicted by accident in the course of a legitimate punishment of Kenneth.''

██ We think the evidence is amply sufficient to show malice aforethought and supports a judgment of second degree murder. Witkin in California Crimes (1963) Volume 1, section 320(a) states:

''(a) Malice 'aforethought' merely means malice at the time of the killing; it need not be a preexisting state of mind. This distinguishes it from the premeditation, or deliberate purpose, required for first degree murder. (See *supra*, § 299; Perkins, p. 30 [observing that word 'aforethought' has little present day meaning, and is retained because of tradition]; 1 Wharton 527 [same].)

''(b) 'Malice' in murder is not used in the popular sense of hatred or ill-will. It may exist even though there is no actual intent to kill; e.g. where the intent is only to cause serious injury, or the killing is in the perpetration of a felony or other unlawful act dangerous to human life. 'Thus the presence or absence of ''malice aforethought'' has come to be determined oftentimes by artificial or technical reasoning, and not always by a simple reference to the actual intent to kill, as made manifest by the circumstances proved in each case. And the crime is equally murder where the malice aforethought is expressly proved and where it is implied—as from the killing in the absence of considerable provocation, or from such wanton recklessness, on the part of the slayer, as shows an abandoned and malignant heart.' (*People* v. *Doyell* (1874) 48 C. 85, 96.) 'It does not follow, merely because the defendant might not perhaps have entertained any personal ill-will toward the deceased, that the shooting and killing of the latter was not with the malice essential to the consummation of the crime of murder.' [Citations.]

''. . . . . . . . . . . .

''In an attempt to tie together the practical applications which give meaning to the concept, Perkins suggests the following inclusive statement of the different kinds of *mens rea* which fulfill the requirement in the absence of justification, excuse or mitigation:

'' '(1) an intent to kill, or (2) an intent to inflict great bodily injury, or (3) an intent to do an act in wanton and wilful disregard of an unreasonable human risk (*i.e.*, the wil-

ful doing of an act under such circumstances that there is obviously a plain and strong likelihood that death or great bodily injury may result), or (4) an intent to perpetrate a dangerous felony, or a felony not dangerous in itself, by means involving a substantial element of human risk (or under some statutes any felony), or (5) an intent to resist a lawful arrest by means involving a substantial element of human risk.' (Perkins, p. 38.)''

Here the appellant at least acted with intent to inflict serious injury. David had suffered at different times a chip fracture of the leg, broken ribs and skull fractures. Evidence of such treatment of a 7-week-old child is ample to warrant a conclusion that appellant acted with intent to inflict serious injury. This court in *People* v. *Lint*, 182 Cal.App.2d 402, 411 [6 Cal.Rptr. 95], said: "This court must keep in mind the rule as stated by this court in *People* v. *Mangiameli*, 149 Cal.App.2d 642, 644-645 [308 P.2d 762], wherein it is set forth:

"'. . . Where evidence, circumstantial or otherwise, establishes that a crime has been committed and that the accused was the perpetrator thereof, an appellate tribunal in reviewing a conviction will not appraise the weight of the evidence but will consider and determine only whether upon the face of the evidence it can justly be held that the trier of facts could not have found sufficient facts to warrant the inference of guilt. In other words, it must be made clearly to appear that the conclusion arrived at in the court below is unsupported by any substantial evidence upon any hypothesis whatever [citation]. As was said in the case just cited, at page 681: "We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict. If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury."''

"Malice in a murder case may be either express or implied. It is implied when there is no considerable provocation or when the circumstances attending the killing show an abandoned or malignant heart. In the case before us there is ample evidence to sustain the verdict which in effect determined that

the defendant had an abandoned and malignant heart and did without provocation or justification kill Pamela Sue Rowe. [Citation.]''

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.