[Civ. No. 33613.   Second Dist., Div. Four.   Nov. 14, 1968.]

ELLIS EUGENE BURGESS, Petitioner, v. THE SUPE-
RIOR COURT OF LOS ANGELES COUNTY, Respond-
ent; THE PEOPLE, Real Party in Interest.

Gruber, Cottrell & Barabedian and John B. Cottrell for
Petitioner.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood, Rob-
ert J. Lord and Harry B. Sondheim, Deputy District Attor-
neys, for Real Party in Interest.

WAPNER, J. pro tem.*—Petition for writ of prohibition
under section 999a of the Penal Code.
Petitioner was charged with the murder of his father.
On August 14, 1968, the superior court made and
entered an order denying petitioner's motion for a dismissal
of the information under the provisions of section 995, Penal
Code. Petitioner based his motion on the fact that there was
no probable cause shown by the prosecution to believe that the
offense of murder had been committed, or that the petitioner
was guilty thereof.

*Assigned by the Chairman of the Judicial Council.

The facts disclose the following: A neighbor of the decedent testified that the defendant came to his house at about 7 a.m. on the 29th day of June 1968, and told the witness that "he couldn't get his dad to respond and to come down and see what happened to him." When the neighbor arrived at the home he told of observing the decedent sitting on the bathroom commode and he looked like he had been scalded. The bathtub was one-half full of water. He further testified that the body was "kind of—it was dry," and also that the floor was damp, meaning that there was some water on the floor. The neighbor went on to testify that he had known the decedent for some time, that the decedent had been ill, especially after having been in an accident and wreck and that due to this accident the decedent had a plate placed in his head and because of this the decedent just couldn't get around. The neighbor also testified that in the month or two preceding his death, the decedent had been getting worse. The neighbor had observed the decedent fall twice within the past two months when he was there to observe him. He stated that the decedent had difficulty with his right leg and had trouble walking. With respect to the defendant's relationship with his father the neighbor testified that they always got along well and that the defendant seemed to do everything he could for his father.

A second neighbor who lived at 2006 West 65th Place (decedent lived at 2002 West 65th Place) said that the night before at about 11 p.m. he heard a noise which he described as "baroom," like someone falling at the decedent's residence, but that he didn't pay too much attention to it. He also stated that he heard a washing machine going at about the same time.

A forensic pathologist testified that the cause of death was asphyxiation secondary to disarticulation of the hyoid bone which is located in the upper portion of the anterior neck. He also described multiple injuries to the decedent, several of which were acute and many of which were of older duration. The pathologist could not determine whether there were any marks in the region around the hyoid bone because of the scalding. He testified that the scalding would obscure marks unless they were very severe; thus, he could not determine with any degree of certainty how or in what manner a blow had been inflicted. In his opinion the scalding occurred after death.

Pathologist also could not determine the time of death. The pathologist testified that his examination of the brain revealed

past history of brain disease. This disease consisted of multiple old areas of infarction commonly called by laymen "a stroke." These strokes and resultant disability were consistent with a person falling as were the acute injuries in the opinion of the pathologist. As a matter of fact the pathologist testified that all of the injuries which the decedent suffered, including those which could have been caused just prior to death, were consistent with falling. The pathologist further indicated that it would have taken at least three falls to have caused the injuries and subsequent death of the decedent and that all three falls could have been just prior to death. Further, he stated, that people with the condition that decedent had commonly fall and that they have difficulty in ambulating. Insofar as the decedent is concerned the pathologist also said that probably a blow would be more severely taken by such an individual because of his condition and his arterial system.

When asked whether the injury across the neck (which was the injury to the hyoid bone) was consistent with a fall by that person across the hard surface of a bathtub, the pathologist testified, "The bathtubs I have seen are several inches wide. The area was several inches. This would be compatible."

Defendant was examined several hours after he was taken into custody and it was noted that he had a bruised right forearm near the elbow. He told the examining physician that he thought he received this bruise a few days prior while giving blood at the Red Cross. (The fact that he gave blood on June 26, 1967, was verified as being true by a police officer who testified at the preliminary hearing. The examination was in the afternoon of June 29.) The physician who examined the defendant testified that in his opinion he did not think the bruise was caused by a tourniquet being applied when the defendant gave blood because tourniquets were usually applied at a position higher on the arm; that he believed that the bruise could have been caused by repeated, prolonged, pressure on the area for five to 25 minutes; a bruise from the application of a tourniquet should go away within 72 hours.

Defendant told the investigating officer that he fell asleep in the living room sometime after 3 or 4 a.m. He awoke at 6 a.m. and remembered that his father was still in the bathroom. He tried to awaken his father after which he pulled him out of the bathtub. He then placed him on the commode and applied mouth-to-mouth resuscitation for about 45 minutes.

When he found that he could not revive his father he went to his neighbor's home for help.

We examine the evidence in the light of the legal proposition that every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. (*Jackson* v. *Superior Court*, 62 Cal.2d 521, 529-530 [42 Cal. Rptr. 838, 399 P.2d 374].) We recognize too that the evidence which will justify a prosecution need not be sufficient to support a conviction and probable cause for a prosecution is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*Rideout* v. *Superior Court*, 67 Cal. 2d 471 [62 Cal.Rptr. 581, 432 P.2d 197].) Consistent with this legal proposition, the defendant claims there is insufficient evidence to show other than an accidental death.

The People obviously take the opposite view and claim that since there were at least three different blows required to produce decedent's injuries, that they were deliberately caused rather than accidental and, further, that the scalding was consistent with an attempt to conceal injuries. They further contend that defendant's connection to this "homicide" is established by his being present at the scene of the alleged "homicide" and that he made a false statement about a bruise on himself which might have been inflicted on him in a quarrel.

Keeping in mind the rule enunciated in *Rideout, supra,* we conclude that the petitioner is correct.

Certainly there is no quarrel with the fact that defendant was present in the home when his father died. It is not contended that any third person was present. Since the magistrate need not have believed defendant's claim that he was asleep between 4 and 6 a.m., the fact of presence would support an inference that defendant was chargeable if there were sufficient evidence that the death was by criminal means. But we agree with defendant that the record does not support an inference that the father died other than by accidental and non-criminal means.

Defendant's statement about the bruise on himself was not necessarily false. It was merely his statement as to how he thought he had received the bruise. The doctor's testimony with respect thereto was his opinion as to where a rubber tourniquet was normally placed. Certainly the nurse or whoever did place the tourniquet on the defendant at the place where he gave his blood might have placed the tourniquet

where defendant received the bruise; or, he may have received the bruise in some other manner.

The People make much about the water heater and when it was turned off because they assert that the defendant used the water heater in such a way as to make the water in the tub hot enough to purposely scald the decedent to cover up wounds allegedly inflicted by the defendant.

The investigating officer testified the defendant told him that the defendant had turned off the hot water heater after he had placed his father in the tub. However, later the defendant said it was possible that he forgot to turn off the water heater. Because of this inconsistency there is no affirmative evidence offered by the People which is incriminating as to the defendant.

The evidence falls short in showing that a criminal offense caused the decedent's death.

Let the peremptory writ issue.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied November 27, 1968, and the petition of the real party in interest for a hearing by the Supreme Court was denied January 8, 1969. Mosk, J., was of the opinion that the petition should be granted.