THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO ALVARADO MATTA, Defendant and Appellant.

### COUNSEL

Alan M. Caplan, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**BROWN (G. A.), P. J.**—Appellant was convicted by a jury of second degree murder in violation of Penal Code section 187. He was denied probation and sentenced to state prison for the term prescribed by law. He was acquitted of a charge of assault with force likely to produce great bodily harm (Pen. Code, § 245), which charge had been consolidated with the murder charge for trial.

The victim, John Fetzer, was taken to the hospital on March 19, 1974, and died there on April 30, 1974. The immediate cause of death was pneumonia which began to develop on April 27-28.

On March 4, 1974, John Fetzer, a farm laborer, withdrew $826 from his bank account in Dos Palos and then went to Merced and rented an apartment. It appears that the victim and appellant occupied separate apartments in the same apartment complex.

On March 19, 1974, the landlord entered Fetzer's apartment and discovered him lying on his bed in a cramped position and called an ambulance. The apartment had no ventilation and the odor of urine was distinct. There were wine and beer bottles and cans on the floor, and it appeared that the victim had vomited. The apartment was filthy and in complete disarray. The evidence developed that over a period of time the victim had been giving money to people to purchase beer and liquor for him.

When Fetzer was discovered he had blood on his head and near his left eye and was unconscious. There was blood on his face and on his shirt which was on the floor. There were bruise marks on his back, rib cage, and the sides of his arms. Neither a wallet nor any money was found.

Ernestine Mosby, who lived in the same apartment complex, was in another apartment with about five other people on March 17, 1974, when appellant, who also lived in the apartment complex, knocked on the door at 3:30 or 4 p.m. looking for someone to go to the store. Mrs. Mosby agreed to go and she went with appellant to Mr. Fetzer's apartment.

Appellant told Fetzer to clean up his apartment; when Fetzer said he did not feel like it, appellant snatched him off the bed and pushed him into the kitchen where he told Fetzer to give him some money to buy beer. Appellant shouted, "You mother-fucker, give me the damn money. I'm going to kick your ass, punk. I want the money right now, mother-fucker." John Fetzer at first told appellant he had no money, but then gave him a $50 bill, which appellant gave to Mrs. Mosby to buy him some beer.

About 10 or 15 minutes after returning with a couple of six-packs of beer and some cupcakes, Mrs. Mosby returned to Mr. Fetzer's apartment with appellant. Appellant asked Mr. Fetzer for some money to clean up his apartment, and Mr. Fetzer said that he had none and told him he wanted to sleep and they would have to leave. Appellant then pulled him from his bed and hit him twice in the stomach and then across his head with his hands clasped together. Appellant hit him in the groin. Appellant also hit the victim near the tail bone and then said to him, "Mother-fucker, you see this? You see this? I know judo. Mother-fucker, I'll fuck you up. Don't lie to me." Fetzer did not fight back. Mrs. Mosby left before appellant, and when she went to the door in the early morning hours of March 18 she saw appellant with his pants down and

Fetzer lying on the bed, also with his pants down. Appellant came stumbling to the door and said "Just go on. Go on. Everything is O.K. This mother-fucker, I'm going to kick his ass."

Julie Williams, Mrs. Mosby's sister, was also in Fetzer's apartment with appellant on the afternoon of March 17. She saw Fetzer lying on his bed, and when he refused to give appellant any money to buy beer appellant hit him in the groin, chest and stomach, at which time Fetzer gave him $50 to buy beer. Julie Williams described what appellant did during his hitting of the victim as follows: "He was just (indicating) giving him a judo chop. He told him, he say, 'I Kung Fu.' Hit him in the chest and down below." She saw appellant push Fetzer's head against the wall and squeeze his head between the bed and the wall.

Larry Williams, Mrs. Mosby's brother, also witnessed appellant's beating of Fetzer and substantially corroborated the testimony of Mosby and Julie Williams. At one point Williams said to him, "You shouldn't hit him like that. You might kill him."

Richard Edward Warness, the physician who examined the victim in the emergency room of the Merced County Hospital, said that Fetzer appeared to be approximately 65 years old. The victim would move only when a painful stimulus was applied. His left pupil was larger than the right, which usually indicates severe head trauma. The victim had multiple contusions about the face and upper chest, and Dr. Warness felt his head injuries were severe.

Dr. Warness concluded that he had been in the same clothing for several days as he had urinated and defecated on them. It also appeared he had not eaten for several days.

Ernest F. Bergmann, Jr., is a physician who was on duty in the emergency room when the victim was admitted. He examined him later in the day when Fetzer was in the intensive care unit and found extensive trauma to the head and body, with bruises on the torso and chest. The victim reacted to painful stimuli only, and one eye was greatly dilated.

Leon M. Becker, a neurosurgeon, operated on the victim on March 20 to remove a blood clot on his brain. Such a condition is generally caused by a blow to the head. The operation, which was necessary to sustain Mr. Fetzer's life, succeeded in removing the clot. However, it was necessary

to repeat the operation six days later as the subdural hematoma had recurred.

Roland C. Kreps, Jr., a physician and radiologist who reviewed the X-rays of Fetzer, discovered fractures of the sixth and ninth ribs. Also, the X-rays of March 19 revealed what was probably blood in the air sacs of the lungs due to a traumatic injury. The lung area was basically cleared on March 25, yet there was residual density. The density in the air sacs increased on April 12, and on April 30 the victim died.

Dorian R. Faber, a physician and pathologist who performed an autopsy on the victim on May 1, noted the extensive degeneration in the lungs and large abscess cavities. The immediate cause of demise was nephritizing bronchopneumonia. He said it is a reasonable conclusion that the blows of March 17 and 18 resulted in the death.

Dr. Faber stated that on April 27 and 28 Fetzer began to develop fulminating pneumonia, which is a type of pneumonia of a patient who has sustained some sort of trauma or injury or harm to the body.

The victim required 10 transfusions of whole blood and blood materials.

Dr. Faber testified that the injuries to the head and other parts of the body could have caused the pneumonia since severe head injuries compromise the ability of the lungs to function normally. In Dr. Faber's opinion, if the victim had already had pneumonia when he was admitted to the hospital he would not have lived the six weeks.

Appellant was arrested on March 19, 1974, at about 5 p.m. and charged with assault with a force likely to produce great bodily harm. (Pen. Code, § 245.) When the victim died on April 30 appellant was charged with murder. (Pen. Code, § 187.)

Appellant testified in his defense. He first stated that although he had been trying to recall what happened on March 17, 1974, he could not remember. He did recall spending the previous night at his mother's house in Merced. He remembered drinking beer in the park between noon and 5 p.m. with Cruz Lopez, who also resided in the apartment complex. Appellant testified that he was drunk and Lopez drove him back to his mother's house.

Appellant claimed that he could not recall being at the victim's apartment on March 17. Appellant testified that one day Fetzer had been drinking and fell on the cement and hit his head and that appellant picked him up and returned him to his apartment.

Although appellant admitted to having only two beers in the five-hour period he allegedly spent with Lopez, he claimed he was drunk before he met Lopez. Later during his testimony, however, appellant said he was not sure if he was drunk before he got to the park.

After testifying that all he could remember of March 17 was drinking in the park and then being driven to his mother's home by Cruz Lopez, appellant was able to recall walking to the bus depot after being taken to his mother's house and learning that a bus ticket to New Mexico would cost $57.77. He could not recall where he went after that, except that at some point he went to his apartment and broke a window to get in. He was also able to remember fighting with a girl he was living with on the morning of March 17.

Cruz Lopez testified that he lived in an apartment next to appellant's. He claimed that he saw appellant on the morning of March 17 when appellant was drinking beer with some other people around the apartments. He said that he and appellant were together in the park across the street from the apartments.

Lopez testified that during the time he was with appellant he never went to the victim's apartment. However, he did admit to seeing appellant talking to Fetzer around 4 p.m. Lopez said that he again saw appellant at 10 or 11 p.m., at which time he drove him back to his mother's house. Sometime after midnight Lopez heard a knocking at the door of appellant's apartment and then heard a window break.

According to Lopez, the victim often had bruises from falling on the sidewalk.

### SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE SECOND DEGREE MURDER VERDICT

Appellant argues that the evidence was insufficient to support a finding of implied malice and insufficient to support a finding that appellant's conduct proximately caused the victim's death.

The evidence presented in the trial court, together with the reasonable inferences to be drawn therefrom, fully supports the verdict. ■ The verdict will not be overturned merely because inferences contrary to those drawn by the jury may be drawn from the evidence. (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) The oft-repeated principle is iterated in *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]:

"This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]

"Before the judgment of the trial court can be set aside' for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]"

■ The mental state constituting malice does not require that the perpetrator harbor any ill will or hatred toward the victim. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911].) Malice aforethought is found where one acts with wanton disregard for human life by doing an act that involves a high probability that it will result in death. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Conley, supra,* 64 Cal.2d at p. 321.)

■ Malice may be implied from a felonious assault without justification or mitigating circumstances. (*Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374].) Thus, malice may be implied from the doing of an act in wanton and willful disregard of an unreasonable human risk, i.e., the willful doing of an act under such circumstances that there is obviously a plain and strong likelihood that death or great bodily injury may result. (See Perkins on Criminal Law (2d ed.) pp. 36-37.) In the present case, the jury could have easily inferred malice from the repeated violent beatings appellant inflicted upon the victim which ultimately resulted in his death and concluded that the assault was neither justified nor the act of one incapable through

intoxication of entertaining malice. (*People* v. *Aeschlimann* (1972) 28 Cal.App.3d 460 [104 Cal.Rptr. 689]; *People* v. *Weisberg* (1968) 265 Cal.App.2d 476, 480 [71 Cal.Rptr. 157]; *People* v. *Butts* (1965) 236 Cal.App.2d 817, 829 [46 Cal.Rptr. 362].)

■ As to the issue of proximate cause, the jury was given full and proper instructions on this issue in the language of CALJIC Nos. 8.55, 8.57 and 8.58 (see *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567 [35 Cal.Rptr. 401]), and there was substantial evidence that the blows administered by appellant were the proximate cause of the death even though the immediate cause of the victim's demise was pneumonia. In sum, that evidence is:

Dr. Warness, the physician who first examined the victim in the emergency room, testified that Fetzer had multiple contusions about the face and upper chest which he felt to be severe. This condition is dramatically portrayed by the photographs in evidence. Dr. Warness also stated that the left pupil was larger than the right, indicating severe head trauma.

Dr. Bergmann examined Fetzer in the intensive care unit and also found one eye to be greatly dilated. He testified that there was a great deal of trauma to the head and body.

Dr. Becker performed surgery on the victim to remove a blood clot on the brain, which was caused by a blow to the head. The operation had to be repeated six days later as the blood clot recurred.

Dr. Kreps, who reviewed the victim's X-rays, discovered what he believed to be blood in the air sacs of the lungs, due to a traumatic injury. The lungs were basically clear on March 25, yet a residual density existed, which density had increased on April 12, and death occurred on April 30.

Dr. Faber, who performed the autopsy, stated that the immediate cause of death was nephritizing bronchopneumonia and that it was reasonable to conclude that the blows of March 17 and 18 resulted in the death. Dr. Faber testified that on April 27 and 28 the patient began to develop fulminating pneumonia, generally found in patients who have sustained injury or harm to the body. He went on to explain that severe injuries to the head compromise the ability of the lungs to function

normally. In his opinion, if the victim had been suffering from pneumonia prior to March 19 when he was admitted, he would not have survived the six weeks.

### FAILURE TO INSTRUCT SUA SPONTE ON THE RELATIONSHIP BETWEEN DIMINISHED CAPACITY OCCASIONED BY VOLUNTARY INTOXICATION AND INVOLUNTARY MANSLAUGHTER

■ Appellant contends that the trial court committed reversible error in failing to instruct, *sua sponte,* that if, due to diminished capacity, the defendant had neither malice nor intent to kill, the offense can only be as great as involuntary manslaughter. Appellant is correct in his assertion that it was error not to so instruct, but under the circumstances of this case we are impelled to the conclusion that the error was nonprejudicial. *People* v. *Ray* (1975) 14 Cal.3d 20 [120 Cal.Rptr. 377, 533 P.2d 1017] requires, inter alia, that the court instruct, *sua sponte,* on involuntary manslaughter in the context of diminished capacity due to a defendant's voluntary intoxication, even though there is no evidence of unconsciousness.

In holding that the failure to instruct was not harmless error, the court in *Ray* observed that: "We are unable to say that the failure to instruct on involuntary manslaughter in the context of diminished capacity was harmless error. The jury was given the choice of first degree murder, second degree murder and voluntary manslaughter and chose the least severe. We cannot say that had it been fully instructed the jury would have convicted defendant of any offense greater than involuntary manslaughter." (14 Cal.3d at pp. 31-32.) It is to be noted that in *Ray* appellant was convicted of voluntary manslaughter, not second degree murder.

In *People* v. *Roberts* (1975) 51 Cal.App.3d 125 [123 Cal.Rptr. 893] (hg. den., Oct. 30, 1975), the defendant was found guilty of second degree murder and the court held that the trial court's failure to give the "diminished capacity-involuntary manslaughter" instruction in compliance with *Ray* did not amount to prejudicial error.

In *Roberts,* the court held that although the defendant was entitled to a *sua sponte* instruction on the relationship between diminished capacity and involuntary manslaughter, the refusal to give defendant's requested instruction was not prejudicial. In this respect the court stated: "The

failure to instruct fully on the relationship between diminished capacity and involuntary manslaughter was error but not necessarily prejudicial. The prejudicial effect of such error is evaluated by determining whether the factual questions that would be presented by the missing instruction were nonetheless resolved adversely to defendant under other, properly given instructions. If so, defendant is not prejudiced by a failure to instruct completely 'since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury.' (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 . . . .)" (51 Cal.App.3d at p. 133.)

In the case at bench, the jury impliedly found malice aforethought; this is necessarily true because of its second degree murder verdict which presupposes malice. Therefore, the jury chose to reject the evidence of diminished capacity as negating malice. Since the preliminary factual question of malice was resolved adversely to defendant, the missing instruction on involuntary manslaughter would similarly have been resolved against the defendant. As such, the defendant was not prejudiced by the court's failure to instruct completely inasmuch as the evidence that would support a finding that only the lesser offense was committed was rejected by the jury. (*People* v. *Roberts, supra,* 51 Cal.App.3d at p. 133.)

In the present case, as in *Roberts,* the court's instructions to the jury included the following. Along with the felony-murder instructions which the jury impliedly rejected with its verdict of second degree murder (CALJIC No. 8.21), the jury was instructed as to the definition of homicide (CALJIC No. 8.00), the definition of murder (CALJIC No. 8.10), and the definition of manslaughter (CALJIC No. 8.37), both voluntary (CALJIC No. 8.41) and involuntary (CALJIC No. 8.48 (rev.ed. 1971)). The jury was instructed upon diminished capacity in the context of first and second degree murder pursuant to CALJIC No. 8.77 (rev.ed. 1974), and voluntary manslaughter pursuant to CALJIC No. 8.41. Malice aforethought was defined for the jury pursuant to CALJIC No. 8.11, and the jury was instructed that murder requires malice while manslaughter does not (see CALJIC No. 8.50). The jury was instructed pursuant to CALJIC No. 8.72 that a reasonable doubt as to whether the killing was murder or manslaughter would require a finding of manslaughter.

The court instructed the jury pursuant to CALJIC No. 8.77 (rev.ed. 1974) which is the outdated instruction relating to voluntary intoxication which amounts to a state of unconsciousness and thereby reduces the

crime to involuntary manslaughter. However, CALJIC No. 8.77 also instructs that diminished capacity due to voluntary intoxication could negate malice or specific intent to kill.[1]

In the instant case, as in *Roberts,* the issue of malice in the context of diminished capacity was thoroughly presented to the jury. The finding of the jury that appellant was guilty of second degree murder is an implicit rejection of appellant's evidence that voluntary intoxication negated malice.

### FAILURE TO INSTRUCT SUA SPONTE THAT EVIDENCE OF ORAL ADMISSIONS SHOULD BE VIEWED WITH CAUTION

■ Appellant argues that the following statements of oral admissions by appellant required the court to instruct *sua sponte* (see CALJIC No. 2.71) that evidence of an oral admission of a defendant ought to be viewed with caution:

"I'm the manager, and I want this place cleaned. You give those girls some money. They'll clean it up for you."

"I'm going to kick your ass, punk."

---

[1]CALJIC No. 8.77 (rev.ed. 1974) reads in relevant part as follows:

"If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a wilful, deliberate and premeditated murder of the first degree.

"Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree. . . . Further, if you have a reasonable doubt . . . . whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, . . . you cannot find that he harbored implied malice.

"Furthermore, if you find that as a result of mental illness, mental defect, or *unconsciousness caused by voluntary intoxication,* his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter." (Italics added and indicates that part of the instruction which is outdated.)

"This mother-fucker, I'm going to kick his ass."

As a general rule the trial court has the duty to give, *sua sponte,* the cautionary instruction regarding oral admissions. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Ramirez* (1974) 40 Cal.App.3d 347, 352 [114 Cal.Rptr. 916].)

However, upon a reweighing of the evidence in the present case, it does not appear that a result more favorable to the defendant would have been reached in the absence of the error, and the omission therefore is not reversible error. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 455; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

It is obvious that these statements were intended to show that appellant intended to inflict an assault upon the victim and that appellant acted in furtherance of his declared intent.

In the present case, however, the corpus delicti is convincingly established independently of the admissions, and the error of omitting the cautionary instruction cannot be deemed reversible. Three eyewitnesses testified as to the actual assault perpetrated upon the victim by appellant; since malice may be implied from the assault itself (*People* v. *Butts, supra,* 236 Cal.App.2d at p. 827), the extrajudicial admissions showing intent to commit the assault are mere surplusage. Here, independent of the admissions, the evidence of guilt is overwhelming. Accordingly, there does not appear to exist a reasonable probability that a jury could have reached a result more favorable to the defendant, and although the omission of the cautionary instruction may have been error it was not prejudicial. (See *People* v. *Sutton* (1973) 35 Cal.App.3d 264, 272 [110 Cal.Rptr. 635].)

### Error in Alleged Failure to Instruct on the Relationship Between Voluntary Intoxication and Specific Intent to Commit the Underlying Felony of Robbery

This contention is unintelligible in view of the fact that the jury was fully instructed on the specific intent required for the commission of the underlying felony of robbery and on intoxication as it may affect the specific intent to commit the underlying felony in the context of the felony-murder doctrine. Moreover, the verdict of second degree murder necessarily means the jury rejected the felony-murder theory.

## ALLEGED ERROR IN FAILING TO INSTRUCT SUA SPONTE ON THE LAW RELATING TO ACCOMPLICE TESTIMONY

Appellant argues that there is evidence that would support a finding that Ernestine Mosby was an accomplice to the second degree murder conviction, requiring the court to give *sua sponte* the pertinent cautionary instructions on the law with respect to an accomplice's testimony. (*People v. Gordon* (1973) 10 Cal.3d 460, 466 [110 Cal.Rptr. 906, 516 P.2d 298].)

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) "In order to be included within this definition, the witness must have 'guilty knowledge and intent with regard to the commission of the crime.' " (*People v. Gordon, supra,* 10 Cal.3d at pp. 466-467.) The obligation to give the instruction does not arise in the absence of some evidence that the witness conspired to procure commission of the crime or aided and abetted in its commission. (Pen. Code, § 31; *People v. Davis* (1954) 43 Cal.2d 661, 672 [276 P.2d 801]; *People v. Kageler* (1973) 32 Cal.App.3d 738, 744 [108 Cal.Rptr. 235]; *People v. Cooper* (1970) 10 Cal.App.3d 96, 102-103 [88 Cal.Rptr. 919].) As the editors of CALJIC have stated in their instruction No. 3.10, "To be an accomplice, the person must have knowingly and with criminal intent aided, promoted, encouraged, or instigated by act or advice, or by act and advice, the commission of such offense."

To establish Mrs. Mosby as an accomplice, appellant points to the evidence that on the afternoon of March 17, 1974, Mrs. Mosby agreed to accompany appellant to the store. They went to the victim's apartment, and there appellant told the victim to clean up the apartment. When the victim refused, appellant snatched him from the bed, roughed him up and threatened him, whereupon Fetzer gave appellant a $50 bill.

Mrs. Mosby was given the money, and she went to the store and purchased a couple of six-packs of beer and some cupcakes, keeping the change. She returned to the victim's apartment with appellant and witnessed appellant hit the victim in the stomach, across the head, and in the groin. Ernestine Mosby then left the apartment. Also, upon walking past the apartment in the early morning hours of March 18, Mrs. Mosby saw appellant with his pants down and the victim on the bed with his

pants down. Appellant told Mrs. Mosby to go away and that ". . . I'm going to kick his ass."

Appellant first argues that the jury could have concluded that Mrs. Mosby was an accomplice in the underlying robbery of the victim on the theory of felony murder. However, the jury impliedly rejected the felony-murder theory by its finding of second degree murder.

As to being an accomplice to the crime of second degree murder, there is no evidence, either direct or circumstantial, from which it can be inferred that Mosby harbored express or implied malice. Mosby made no oral admissions from which such intent can be inferred; since there is no evidence that she in any manner participated in the assault, malice on her part cannot be implied from her conduct. A fortiori, Mosby lacked guilty knowledge and intent with regard to the commission of the murder and therefore was not liable to prosecution for the identical offense charged against appellant. Although there is evidence that Mosby was present at the scene during part of the time the crime was committed, it is well settled that mere presence at the scene of a crime cannot, in itself, make a person an accomplice. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 958 [114 Cal.Rptr. 632, 523 P.2d 672].)

Accordingly, we conclude there was no error in not giving the accomplice instructions.

### FAILURE TO INSTRUCT SUA SPONTE ON ASSAULT WITH INTENT TO COMMIT MURDER AND ATTEMPTED MURDER

Appellant argues that the court had a *sua sponte* duty to instruct on the crime of assault with intent to commit murder (Pen. Code, § 217)[2] and attempted murder.

█ There was no duty to instruct *sua sponte* on the offense of assault with intent to commit murder under Penal Code section 1159 because that offense is not a necessarily included offense within the offense of murder. This is obviously true because the offense of murder can be accomplished without in the process committing the purported lesser offense of assault with intent to commit murder. Murder can be

---

[2]Penal Code section 217 provides: "Every person who assaults another with intent to commit murder, is punishable by imprisonment in the State Prison not less than one nor more than fourteen years."

accomplished without the commission of an assault, and murder may also be accomplished without the intent to commit murder. For example, no such intent is a legal element of murder where malice can be implied from the willfully doing of an act under such circumstances that there is obviously a plain and strong likelihood that death or great bodily injury may result. (See *Jackson* v. *Superior Court* (1965) 62 Cal.2d 521 [42 Cal.Rptr. 838, 399 P.2d 374].)

■ As to the attempt, appellant argues that since there was evidence that the assault upon the victim may not have been the proximate cause of death, the jury could have found him guilty of attempted murder, thus exonerating appellant from the murder charge and making the instruction mandatory. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Cooper* (1968) 268 Cal.App.2d 34, 37 [73 Cal.Rptr. 608]; *People* v. *Morrison* (1964) 228 Cal.App.2d 707, 712 [39 Cal.Rptr. 874].)

The jury was properly instructed on proximate cause as a necessary element to a finding of murder or manslaughter. Implicit in the second degree murder verdict is the jury's finding that appellant's acts proximately caused the victim's death. Even if the jury had been instructed on the lesser included crime, the key factual issue which would be raised by such instruction would have been the same material issue which was raised by the instructions actually given and which was resolved adverse to appellant; that key factual question was whether appellant's conduct proximately caused the victim's death.

Since the evidence presented which would have supported a lesser offense was rejected by the jury (that appellant's acts did not proximately cause the death), the error, if any, was not prejudicial. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.)

■ The harmless error test (*People* v. *Watson, supra,* 46 Cal.2d 818) is inapplicable in determining whether the failure to instruct on lesser included offenses mandates a reversal. (*People* v. *Sedeno, supra,* 10 Cal.3d at pp. 720-721.)

However, under the authority of *People* v. *Sedeno, supra,* the error can be cured in appropriate circumstances by examining the verdict in the light of the instructions given and finding that the jury necessarily resolved, although in a different setting, the same factual question that

would have been presented if the omitted instruction had been given. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 720.)

### INADEQUATE TRIAL COUNSEL

Appellant's ·allegations of inadequate trial counsel are based upon facts not appearing in the record and therefore on direct appeal should not be considered. (*People* v. *Gardner* (1969) 71 Cal.2d 843, 854-855 [79 Cal.Rptr. 743, 457 P.2d 575].) In the interests of judicial economy, we have considered the allegations and found them inadequate to prove counsel was incompetent or ineffective as a demonstrable reality. None of the matters complained of resulted in the withdrawal of a crucial defense or reduced the trial to a farce or a sham. (*People* v. *Martinez* (1975) 14 Cal.3d 533, 538 [121 Cal.Rptr. 611, 535 P.2d 739]; *People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Ibarra* (1963) 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].)

The judgment is affirmed.

Gargano, J., and Franson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 26, 1976.