[Crim. No. 10790. Second Dist., Div. Three. July 26, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ELBERT LAVON BRELAND, Defendant and Appellant.

Erling J. Hovden, Public Defender, and Kazuo Watanabe for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Harry Sondheim, Deputy District Attorneys, for Plaintiff and Respondent.

FORD, J.—The first question presented on this appeal is whether the defendant who pleaded guilty in the municipal court to the offense of battery, a misdemeanor, and was sentenced therefor, was subject to prosecution and punishment for the crime of murder upon the victim's subsequent death caused by the battery. If such question is resolved against the defendant, the sufficiency of the evidence to sustain the conviction of murder of the second degree must then be considered.

The records show that on May 6, 1964, a complaint was filed in the municipal court charging the defendant with the commission of a battery (Pen. Code, § 242), it being alleged therein that he willfully and unlawfully used force and violence upon the person of Wesley Winston Nealon on or about May 5, 1964. It was issued by the City Attorney of the City of Los Angeles. The defendant did not procure the filing of the complaint. On May 7, 1964, the defendant entered a plea of guilty to the offense of battery. He was thereupon sentenced to be punished by imprisonment in the county jail for the term of 30 days and he commenced to serve such term on that day, May 7, 1964. Mr. Nealon died in the Los Angeles County General Hospital on May 26, 1964. On May 28, 1964, the district attorney issued a complaint charging the defendant with the murder of Mr. Nealon. A preliminary hearing was had and on June 18, 1964, an information by which the defendant was accused of murder was filed in the superior court. In a trial by jury he was found guilty of murder of the second degree. His motion for a new trial was denied, probation was denied, and he was sentenced to be punished by imprisonment in the state prison for the term prescribed by law. His appeal is from the judgment.[1]

A summary of the testimony at the trial will be given. William A. Mazzoni, a police officer for the City of Los Angeles, testified that on May 5, 1964, at approximately 9 p.m. he was in the vicinity of 51st Place and Vermont Avenue with his partner, Officer Gould. Both officers were in civilian clothes and were traveling in an unmarked police vehicle. He saw two men engaged in a fist fight on the northwest corner of the intersection. The officer testified that one of the men, Mr. Nealon, appeared ''to be holding his hands in front of him, attempting to protect himself from the blows which were being

---

[1] In the notice of appeal it is also stated that the defendant appeals from the order denying his motion for a new trial, but that order is not separately appealable. (*People* v. *Bernhardt*, 222 Cal.App.2d 567, 571 [35 Cal.Rptr. 401].)

struck by the defendant.'' When he first saw them, both men were on their feet. Thereafter Mr. Nealon fell to the sidewalk. What then ensued was described by the officer as follows: ''A. He [the defendant] stood over him, standing in a prize-fighter's stance. Nealon was attempting to gain his feet, and was struck and again fell to the sidewalk. Then the defendant began kicking Mr. Nealon. Then Mr. Nealon attempted to gain his feet again. There was a light standard. He grabbed the light standard, was holding on, trying to gain his feet. And the defendant began striking him with his fists. Nealon again fell to the ground. And then this defendant stood astraddle, over him, and was punching him with his hands. Then he stepped back off of him and began kicking him. By then we were there. Q. Now, when you saw the defendant kicking Mr. Nealon, did you see whereabouts on the body of Mr. Nealon the kicks were landing? A. In the head, chest, stomach area.''

The officers took the defendant to the police station. They also took Mr. Nealon, who complained of injury, with them. In the officer's opinion, Mr. Nealon was drunk. As the officer was preparing a report at the police station, Mr. Nealon fell out of the chair onto the floor, landing on his back, and after he was helped back into the chair, he fell onto the floor a second time. Mr. Nealon was then sent by ambulance to the Central Receiving Hospital. On cross-examination the officer expressed the opinion that the defendant was not drunk.

Officer Gould testified that upon first observing the fight he saw Mr. Nealon falling to the ground. He got up. The officer's attention was then distracted as he was driving the police vehicle over to the corner. When he made his next observation Mr. Nealon was again on the ground and the defendant kicked him. In response to an inquiry as to what part of Mr. Nealon's body was kicked, Officer Gould stated: ''It appeared to be in the chest or stomach area, as the deceased was lying on the ground kind of bundled up in an attempt to protect himself.''

Dr. N. S. R. Maluf testified that he was on duty when Mr. Nealon arrived at the Central Receiving Hospital in Los Angeles at approximately 10 p.m. on May 5, 1964. Part of his testimony was: ''He had abrasions of both shins and small bleeding point near the base of his genitals. He says he was kicked there. There was no hematoma at the time. The knees were essential[ly] normal. . . . His blood pressure was normal and his pulse was essentially normal, full and regular.

The abrasion was cleansed, and he was told to go for further treatment to the County Hospital if considered that necessary [*sic*]. And his condition on discharge here was reported as good. . . . He had been in the Central Receiving for one hour and 21 minutes.''

At 1:49 a.m. on May 6, 1964, Mr. Nealon returned to the hospital. With respect to that occasion a portion of Dr. Maluf's testimony was as follows: ''At this time he complained of discomfort in the chest. He put his hand on his chest here. (Indicating.) His lungs were examined and found to be clear. And there was no dissymmetry of breathing, no evidence of suggestion of bruises. There were no bruises. And his blood pressure was normal. Again his pulse was even a little lower than it was on his previous admission. And he made a remark that he was supposed to be in court at nine in the morning at Santa Ana . . . to explain to the Judge why he wasn't sending enough money to the children, that he was divorced. And it was suspected that he might actually be malingering, actually wanting to feign that he was ill. This was after the examination, mind you, all of this. And he was then advised to go to the Los Angeles County Hospital on his own. And his condition again was reported as good. There was no statement of abnormal pain at the time, nor was there any bruises on the abdomen or chest.'' Since Mr. Nealon was creating a disturbance, police officers were called and they removed him from the hospital at 2:16 a.m.

Charles R. Casner, a police officer for the City of Los Angeles, testified that on the morning of May 6 he and his partner took Mr. Nealon into custody at the Central Receiving Hospital and booked him at the main jail division on a charge of being drunk.

Arthur Logue, a police office for the City of Los Angeles, testified that the case was assigned to him for investigation at 8 a.m. on May 6, 1964. About an hour and a half later he went to Mr. Nealon's address, but he was not there. Thereafter he learned that the receiving hospital had ''advised Los Angeles County Hospital if necessary.'' The officer then checked the records of the county hospital and found that Mr. Nealon was not there. He was not told that Mr. Nealon had left the receiving hospital in the custody of officers. On May 26, 1964, the officer was advised by the office of the county coroner that Mr. Nealon had died in the Los Angeles County General Hospital on that date. That was the first time that he learned that Mr. Nealon had been in that hospital. The officer then

presented the information which he had to the office of the district attorney and obtained a complaint against the defendant.

Dr. William E. Ostermiller, Jr., a surgical resident at the Los Angeles County General Hospital, testified that Mr. Nealon was admitted to that hospital on May 8, 1964. Mr. Nealon was then in the custody of the police. Dr. Ostermiller described his condition as follows: "He had a perforation of the small bowel, causing acute inflammation and infection of the peritoneum." In his opinion, Mr. Nealon's injury was due to a blow to the abdomen. Ordinarily such an injury would not be caused by a fall to a flat surface, but it could result from a direct blow of some kind. With respect to the treatment afforded Mr. Nealon, the witness testified: "He had surgery on the 9th of May, 1964, which consisted of sewing up the perforation that existed in the bowel, along with washing out the peritoneum; and post-operatively the patient received massive intravenous and intra-muscular antibiotics along with infusions of blood plasma and electrolytes, and other support-ive measures to remedy his problem." Dr. Ostermiller further stated that the peritonitis resulted from the initial perfora-tion.

Dr. Harold Kade, who performed an autopsy on the body of Mr. Nealon, expressed the following opinion: "Based on the autopsy findings it is my conclusion that the death . . . resulted from traumatic perforation of the jejunum, with peritonitis and septicemia. This means a tear of the small bowel, with peritonitis, which is pus formation in the abdomi-nal cavity, and septicemia, which is blood poisoning from germs spread throughout the body." Dr. Kade further testi-fied as follows: "Injuries of tears of the jejunum or other parts of the small bowel generally almost always result from impacts of force to the abdominal wall, causing a rupture or tear to occur." Dr. Kade also stated that such an injury could be caused by a direct blow to the area but that such an injury would be "most unlikely" as a result of falling against a flat surface such as a floor. In response to an inquiry as to whether the perforation of the jejunum was the primary cause of the death, Dr. Kade replied: "That was the basic underlying cause, resulting in the peritonitis which is the general infec-tion in the abdominal cavity and ultimately causing his death by way of septicemia or blood poisoning from the germs."

The defendant did not testify and did not call any witness in his behalf.

There are several aspects of the defendant's contention that he was not subject to prosecution for murder because of the proceedings in the municipal court to which reference has been made. We turn first to the issue raised by his plea of once in jeopardy. (See Pen. Code, § 1016.) The reasoning of our Supreme Court in *People* v. *Rehman,* 62 Cal.2d 135 [41 Cal. Rptr. 457, 396 P.2d 913], furnishes guidance as to the point in time at which the act of the defendant became the basis for a charge of felonious homicide. It was stated therein at page 139: "It is obvious that the offense of manslaughter had not been committed until the victim died. Until death occurred, there was no manslaughter; and before the moment of death, defendant could not have been investigated and prosecuted for manslaughter. [Citations.] If a crime is defined as an act irrespective of the consequences, the crime is the act; but if a crime is defined to include some consequences of the act, the crime is the consequence when produced by a human agency. [Citation.]

"In this state, the law makes the crime of manslaughter a composite one. The striking of the victim does not alone make the crime, nor does the death of the victim without a striking (or some other conduct or force) make the crime; it is a combination of the two."

Under the factual situation in the present case, the claim of once in jeopardy is untenable in the light of the governing law set forth in *People* v. *Wilson,* 193 Cal. 512 [226 P. 5], a case in which the victim of an automobile accident died after the commencement of the trial of the defendant on the misdemeanor charge arising from his conduct. In holding that the ensuing prosecution for manslaughter was proper, the Supreme Court stated (193 Cal., at p. 515): "The law upon this subject is well settled in its application to cases where the defendant has committed an act of violence which in its immediate result amounts to a misdemeanor, but which in its after consequences upon the victim of the violent act becomes, through the death of that victim, murder or manslaughter. In such an event the second prosecution is not for the same offense as the first; and the reason for this is, as is well stated in Wharton on Criminal Pleading and Practice, ninth edition, section 476, 'that as at the time of conviction of assault there could have been no conviction of the homicide the prosecution of the homicide is not barred by the conviction of the assault.' "

We turn then to the other aspects of the defendant's contention. The provisions of section 654 of the Penal Code[2] embody protection both from multiple prosecutions and from multiple punishment. (*Neal* v. *State of California,* 55 Cal.2d 11, 21 [9 Cal.Rptr. 607, 357 P.2d 839].) The rule against multiple prosecutions is a procedural safeguard designed to prevent harassment. (*Kellett* v. *Superior Court,* 63 Cal.2d 822, 825 [48 Cal.Rptr. 366, 409 P.2d 206].) In the present case, however, at the time the misdemeanor charge of battery was filed, as well as at the time the defendant pleaded guilty thereto and was sentenced, the office of the district attorney, the public law office charged with the duty of undertaking felony prosecutions, was not aware of the likelihood of a death resulting from the act of the defendant. Moreover, under the facts set forth above it cannot be said that the police were derelict in failing to direct the attention of the district attorney to the matter. Unlike the situation in the *Kellett* case, by the prosecution of the defendant for the death of Mr. Nealon the People did not subject him to harassment of such a nature as to constitute fundamental unfairness under the concept of due process embodied in the Fourteenth Amendment. (See *Ciucci* v. *Illinois,* 356 U.S. 571, 575 [78 S.Ct. 839, 2 L.Ed.2d 983].)

The conclusion that section 654 did not bar the prosecution for murder in the present case finds support in the reasoning of the *Kellett* case which was expressed as follows (63 Cal.2d, at pp. 827-828) : ''We recognize that in many places felonies and misdemeanors are usually prosecuted by different public law offices and that there is a risk that those in charge of misdemeanor prosecutions may proceed without adequately assessing the seriousness of a defendant's conduct or considering whether a felony prosecution should be undertaken. When the responsibility for the prosecution for the higher offense lies with a different public law office there is also the risk that a well advised defendant may plead guilty to a misdemeanor to foreclose a subsequent felony prosecution the misdemeanor prosecutor may be unaware of or may choose to ignore. Cases may also arise in which the district attorney is reasonably

---

[2]Section 654 of the Penal Code is in pertinent part as follows: ''An act or omission which is made punishable in different ways by different provisions of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.''

unaware of the felonies when the misdemeanors are prosecuted. In such situations the risk that there may be waste and harassment through both a misdemeanor and felony prosecution may be outweighed by the risk that a defendant guilty of a felony may escape proper punishment. Accordingly, in such cases section 654 does not bar a subsequent felony prosecution except to the extent that such prosecution is barred by that section's preclusion of multiple punishment.''

There is no ready precedent with respect to the application of the rule against multiple punishment to the facts of the present case. In the *Kellett* case we are told (63 Cal.2d, at p. 828) that ''the risk that a defendant guilty of a felony may escape proper punishment as a result of a conviction of a lesser offense is inherent in the preclusion by section 654 of multiple punishment.'' But the present case is not one in which the prosecuting officer had an opportunity ''carefully to assess the seriousness of a defendant's criminal conduct before determining what charges should be prosecuted against him.'' (See 63 Cal.2d, at p. 828.) Moreover, the sentence of 30 days in jail imposed before there was knowledge of the seriousness of Mr. Nealon's condition was a rather minimal punishment when measured against the penalty for murder in the second degree of imprisonment in the state prison from five years to life.[3] (Pen. Code, § 190.) If, as said in the *Kellett* case, the risk of harassment through both a misdemeanor and felony prosecution may be outweighed by the risk that a defendant guilty of a felony may escape proper punishment, as is true in the present case, by a parity of reasoning the rule against multiple punishment is satisfied by a provision in the judgment that the defendant be given credit for the time served pursuant to the sentence imposed in the misdemeanor case.[4] The Adult Authority will thereby be enabled to

---

[3] In *Neal* v. *State of California, supra,* 55 Cal.2d 11, at page 20, our Supreme Court stated: ''The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability.''

[4] In a recent note in the Yale Law Journal on the subject of double jeopardy it is stated: ''A comparable problem arises where the defendant has been tried for an offense such as assault, but subsequent events alter the nature of the offense, *i.e.*, the victim dies of injuries inflicted during the assault. A subsequent trial for manslaughter should not be permitted unless the trial for assault resulted in a conviction. If the defendant is then convicted of manslaughter the unserved segment of his sentence for assault should be vacated and the segment already served should be credited toward his sentence for manslaughter.'' (75 Yale L.J. 262, 291 n, 132 (1965).)

include in its consideration the time served pursuant to the judgment in the prosecution for battery.

The matter remaining for consideration is the sufficiency of the evidence to sustain the conviction of murder of the second degree. There was no evidence as to the circumstances under which the fight started. But there was evidence which was sufficient to sustain the determination that the defendant gave Mr. Nealon an unmerciful beating while Mr. Nealon was in a helpless condition. After a review of the evidence we have concluded that the defendant's contention is untenable under the governing law, which was expressed in *People* v. *Ogg,* 159 Cal.App.2d 38, at page 50 [323 P.2d 117], as follows: ''Malice may be express or implied. 'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (Pen. Code, § 188.)

''There is no substantial basis in the evidence for a finding of express malice. Defendant's conviction of second degree murder must therefore rest upon a finding of implied malice. 'The implied malice as described in section 188 of the Penal Code requires no specific intent to kill, and the distinguishing characteristic between murder and manslaughter is malice rather than the presence or absence of an intent to kill.' (*People* v. *Mears,* 142 Cal.App.2d 198, 204 [298 P.2d 40].) 'If the jury found that there was no considerable provocation and that the defendant acted with an ''abandoned and malignant heart'' the ''malice'' would be ''implied'' and the murder would be of the second degree.' (*People* v. *Bender,* 27 Cal.2d 164, 178 [163 P.2d 8].)''

The evidence in the present case reveals no ''considerable provocation'' sufficient to reduce the offense to voluntary manslaughter. The record sustains the conviction of the defendant of the crime of murder of the second degree. (See *People* v. *Cayer,* 102 Cal.App.2d 643, 648-649 [228 P.2d 70].)

The attempted appeal from the order denying the defendant's motion for a new trial is dismissed. The judgment is modified by adding thereto, immediately following the provision that the ''defendant be punished by imprisonment in the State Prison for the term prescribed by law,'' the provision that ''The defendant shall be given credit for the time served

by him in jail pursuant to the sentence imposed for the offense of battery in case No. 209103 in the Municipal Court of Los Angeles Judicial District.'' As so modified, the judgment is affirmed.

Shinn, P. J., and Kaus, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 14, 1966.