Filed 5/28/14  P. v. Cruz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL HECTOR CRUZ,<br><br>    Defendant and Appellant. | F065388<br><br>(Super. Ct. No. BF131174A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Miguel Hector Cruz guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] and of driving a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a)). The jury rejected the prosecution's theory that the murder was premeditated and committed in the commission or attempted commission of a robbery (§§ 187, subd. (a); 190.2, subd. (a)(17)(A)).

Cruz was sentenced to state prison for a term of 15 years to life on the murder, plus a consecutive 16 months on the driving conviction.

On appeal, Cruz contends that his conviction must be reversed because the evidence is insufficient to prove either murder or manslaughter; that his conviction must be reduced to voluntary manslaughter because the evidence was insufficient to prove that malice was not negated by provocation or unreasonable self-defense; that the trial court abused its discretion in allowing the expert to opine that the victim's death was a homicide; and that the trial court erred in denying his request to instruct on involuntary manslaughter. We affirm.

## STATEMENT OF THE FACTS

In February of 2010,[2] Isaias Montes Quiroz (Montes) lived in Lamont, California, where he ran the El Nuevo Amanecer restaurant. Montes, a known homosexual, typically wore a lot of jewelry and carried his money in a black fanny pack. He was 46 years old, five feet nine inches tall, 174 pounds, and diabetic. Cruz, who was 20 years old and from El Salvador, was a regular customer at Montes's restaurant where Montes gave him free food and drinks.

Salvador Hernandez, a restaurant employee, saw Cruz talking to Montes on February 14. That afternoon, around 2:30 or 3:00 p.m., was the last time Hernandez saw Montes. At the time, Montes was wearing his usual jewelry (chains, rings, bracelet), and

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] All further references to dates are to 2010 unless otherwise stated.

2.

he had his black fanny pack. Lucia Rodriguez, Montes's landlord, last saw Montes on the afternoon of February 14, as did Montes's sister, Quilinia Roque.

Hernandez spoke with Montes on the phone later that afternoon, telling him that they needed change from the restaurant's safe. Montes said he was on his way, but never arrived. Restaurant workers called Roque and told her Montes was not picking up his cell phone. Roque called around, looking for Montes. She spoke to Rodriguez, who had already reported Montes as missing to the police.

On the afternoon of February 14, Bharat Mehta, the operator of the Budget Inn Motel in Bakersfield, rented room 108 to Montes. Montes was alone at the time and told Mehta not to tell anyone he was there. Later, Mehta walked past the room, saw that the door was ajar and heard the shower running. When Mehta went by again hours later, the door was open further and the shower was still running. Mehta entered the room and saw Montes's body. He left and called 911.

Bakersfield Police Detective Kevin Findley responded to the scene. When he arrived, the mattress was off the box spring a couple of inches. A Nike shoeprint was found in the kitchenette; a black bag with money and two condoms was found in the room. Montes was found in the shower, wearing no jewelry.

Rebecca Stokes, who supervises the Bakersfield Police Department's crime scene unit, videotaped the scene and took photographs. There was a large amount of blood on the sheets and bedspread; the nightstand had blood smear, stains, and spatter on it; there was blood on the wall between the nightstand and the bed; there was blood spatter on the wall between the kitchenette and bathroom; and there was a blood stain on the bathroom door. In the kitchenette, Stokes saw what appeared to be a mixture of blood and water on the floor and counter and blood smears on the front of the refrigerator and a door frame. Stokes found a tooth with a root attached on the bedroom carpet and another one on the bathroom floor. There were blood soaked towels, a black bag and a beer bottle under the bed. There was a cell phone and a red apron in the trash can.

3.

Forensic Pathologist Kathleen Enstice, MD, performed an autopsy on Montes. Montes's jeans were unzipped and unbuttoned at the waist and his belt was unbuckled. The insides of his front pants pockets were turned inside out. His face, covered in blood, had a deep laceration, a bruised and swollen right eye, and multiple scratches around his nose and mouth and on the right side and front of his neck. He had petechial hemorrhages in his right eye, a horizontal abrasion on the left upper region of his chest, and a bruise near his sternum. Montes's arms, hands, and fingers were cut and bruised.

Dr. Enstice found evidence that Montes had breathed in blood for some time before dying. He had swallowed 990 milliliters of blood. He had an area of hemorrhage in the frontal region of his skull on the right side and a smaller hemorrhage to the left back side of his skull. Montes's skull was depressed and fractured on the right side, and the base of his skull was fractured on the left side. He had multiple fractures underneath his brain, multiple contusions to the brain, and torn tissue both inside and outside the brain. According to Dr. Enstice, the amount of blood and the depth of the injuries implied the use of "a tremendous force."

Montes's neck and the structures within had hemorrhaged. He had lacerations just outside the opening to his vocal cords, with hemorrhages on either side. His denture was dislodged and pushed into his left tonsil. Three of his teeth had been knocked out and the surrounding gums torn. He had a large laceration to his tongue and multiple bruises to his tongue and inside both lips and cheeks. Montes also had large "scald-type" burns over 12.5 percent of his body. No alcohol was detected in his body.

According to Dr. Enstice, Montes died from blunt head and neck trauma and partial strangulation. The trauma to his head and neck was not from a single blow; more than one impact caused the injuries. Dr. Enstice opined that a person with Montes's injuries would not have been able to walk. And she opined that the dent in the nightstand was insufficient to explain all of Montes's injuries, nor did she think Montes sustained

4.

the injuries from falling on his own. Although Montes was a diabetic, Dr. Enstice concluded that Montes's death was a homicide and not due to other causes.

Detective Patrick Hayes, the lead investigator in Montes's death, smelled beer when he entered the motel room. From the cell phone found in the room, Detective Hayes learned that a call had gone out to Montes's restaurant at 3:44 p.m. and someone tried to call the cell phone after 6:00 p.m. Detective Hayes found out later that evening that Montes's car, a PT Cruiser, was missing. The car was located the following day in a large field outside Lamont. The key had been broken off in the ignition, a window was smashed, and the glove compartment was open and looked as though it had been rifled.

Jesus Mendoza, who worked at El Dorado Jewelers in Lamont, bought a gold ring from Cruz, who identified himself as Luis Aguilar, on February 20, for $500. Cruz returned two days later and said he worked at a local market. Mendoza then purchased a half of a man's bracelet from Cruz. That the ring and bracelet belonged to Montes and was worn by him on February 14 was established by witnesses Rodriguez, Roque, and Hernandez. Detective Hayes went to the jewelers on February 27 and Mendoza gave him receipts of his recent purchases from Cruz, described Cruz for him and told him where he said he worked. Detective Hayes went to the market where Cruz supposedly worked, but found no one matching that description.

Cruz returned to the jewelers later on February 27 and Detective Hayes happened to call the store while he was there. Cruz wanted to sell the other half of the bracelet and told Mendoza that he had another gold bracelet as well that he wanted to sell later. Detective Hayes and other officers arrived and arrested Cruz. Cruz had no obvious or substantial injuries on him at the time.

Detective Hayes obtained a search warrant for Cruz's residence and for his girlfriend's home. In Cruz's closet were a pay stub, a fictitious social security card bearing Cruz's name, and a couple of gold necklaces.

5.

Carol Williams, a forensic laboratory technician with the Kern Regional Crime Laboratory, examined physical evidence found in Montes's motel room and on his body for the presence of biological fluids. Numerous items of clothing, towels, and a bathmat tested positive for blood; the front of Montes's underwear tested positive for semen. Nike shoes belonging to Cruz tested positive for blood.

Ruth Dickover, a criminalist from the Kern Regional Crime Laboratory, testified fingernail scrapping from Montes's hands tested positive for blood of at least two people; Cruz and Montes were possible contributors. Montes's fingernail scrapings reflected high ratios that they belonged to Cruz and Montes rather than someone else and Montes. Blood on both Nike shoes was a match to Cruz. Another blood stain on the left shoe was a mixture of at least two people; there was a very high probability that the contributors were Montes and Cruz.

### Defense

Anthony Laws[3], who lived at the Budget Inn Motel in February, recalled telling officers that he heard people "having sex" at the motel on the night in question, but denied telling an officer that he heard at least three people arguing in room 108. He did not recall an officer returning 10 days later to confirm his original statements. And he denied making numerous statements to Detective Hayes. On cross-examination Laws testified that he did not recognize Cruz or a photograph of Montes, and he did not see or hear anything happening in room 108.

Detective Hayes was recalled and testified that Laws, when asked about February 14, had told him that he had heard three voices "fussing" or "arguing" coming from "that room" between 5:00 and 6:00 p.m. About 10 or 15 minutes later, Laws saw two Hispanic men get in a vehicle and leave. He assumed they came from room 108. Laws had told another officer that he had heard moaning or yelling around 4:00 p.m., but he did not

---

[3]    Laws was arrested on February 19 and was currently in prison for robbery.

know where it came from and he said nothing about anyone arguing or men leaving in a vehicle.

Elsa Gomez, an investigator with the Kern County Public Defender's Office, spoke with restaurant employee Hernandez three weeks before trial about his contact with Montes. Hernandez told her that Montes left the restaurant on February 14 at about 2:00 p.m. to begin collecting debts in various places, including Bakersfield. Gomez also interviewed Cruz's employer.

Detective Herman Caldas testified that he was one of three detectives investigating the case. When he interviewed Cruz, he observed a small cut on a finger and a minor injury on his lip.

Armando Linares, who worked at the La Mexicana Market in Lamont, testified that one time Montes came to the market looking for Cruz. Linares employed Cruz at the market and rented a room to him for $200 a month. According to Linares, Cruz worked for about a month, but he had difficulty as he could not work the meat scale and he was limited in the tasks he could perform. Linares testified that Cruz also worked selling popsicles and at a pallet company. According to Linares, Cruz had a girlfriend.

Anna Chiles, a psychologist, evaluated Cruz and diagnosed him with borderline intellectual functioning as part of dementia. His memory and ability to learn were compromised. The diagnosis of dementia was secondary to his use of drugs, especially inhaling glue. According to Dr. Chiles, Cruz does not understand language well and gets confused. The more demanding a situation, the more confused he gets. On cross-examination, Dr. Chiles acknowledged that four other doctors found Cruz was malingering.

Cruz testified in his own defense. He had only known Montes for four months and, when he ate at Montes's restaurant, Montes would give him free food and beer. On four occasions, Montes came looking for Cruz at the market where he worked. Cruz

lived with his girlfriend, Milady, but kept his belongings in a room he rented from Linares.

On February 14, Cruz went to Montes's restaurant and drank beer supplied by Montes. Montes told him they could go to a hotel in Bakersfield and that he had two girls, one for each of them. Cruz got into Montes's car. After a couple of stops, they went to a gas station where Montes bought two 24-ounce beers. Cruz drank one immediately and Montes told him to keep the other one for the hotel.

At the hotel, Montes took off his jewelry and put it on a little table. Cruz and Montes drank from one beer can. Cruz then took three lines of white powder given him by Montes. Montes propositioned Cruz for sex, but Cruz told him no. Montes told Cruz he would give him the ring and bracelet if he would have sex with him. Montes told Cruz a girl was on the way for him, but it was Cruz that Montes wanted. Cruz and Montes ended up in a fight because Montes tried to force himself on Cruz.

Cruz testified he was injured in the fight. He had a cut on each side of his head where Montes hit him with a bottle. He had some cuts on his arms and on his chest from Montes and a cut on a finger, all of which he showed to the jury. During the fight, Cruz hit Montes with his right hand and Montes hit himself on the small table. Montes hit the table a second time with his teeth when, as the two choked each other, Cruz head-butted Montes. After Cruz hit him twice, Montes got up, went into the bathroom and turned on the shower. Montes fell in the shower. Cruz got scared and started to clean up. He put Montes's money under the bed along with some towels and a beer bottle. Cruz took the car keys and jewelry off the small table and left in Montes's car, which he later abandoned.

Cruz denied that he intended to rob Montes or wanted to kill him. He admitted selling the ring and half of the bracelet and giving the money to Milady.

On cross-examination, Cruz said he heard Montes turn the shower on and then fall, but he did not remember whether he went in to check on him. He thought Montes

8.

was wearing a red apron, but he did not recall moving it nor did he know how it got into the kitchen sink. He acknowledged that he did not have permission to take Montes's car, and he acknowledged leaving the car in a field and breaking off the key. Cruz denied telling Detective Caldas that the cut on his finger came from work or that the injury to his lip came from Milady. He did not remember whether or not he had an injury to his forehead from head-butting Montes.

Cruz was not sure why he took Montes's jewelry. He was afraid and forgot to throw it under the bed. He denied that the injuries to his chest occurred prior to the incident in question on February 9, 2012, while he was in custody. And he denied being subsequently treated while in custody for six one- to two-inch cuts across his chest.

Detective Caldas was recalled and testified that, when he interviewed Cruz, he initially lied to him, but in his final version of the incident said Montes abused him, jumped on him and wanted to kill him. He said that Montes wanted to have sex with him. Cruz did not tell Caldas that Montes went to the bathroom after the fight until Caldas asked him if that was what had happened. Cruz told him the injury to his lip was caused by his girlfriend biting him. He told Caldas that he had been with his girlfriend for a year and a half, but he did not know her last name. Cruz told Caldas he could not read street signs.

On cross-examination, Caldas testified on the various versions of the events that Cruz gave when he was interviewed. At the time of his arrest at the jewelry store, Cruz first stated that he bought the jewelry. He then said "a girl" gave it to him. Cruz made various inconsistent statements as to how long he had been with his girlfriend and where he worked. When asked where he was on Valentine's Day, Cruz said that he gave a rose to his girlfriend and worked that day, giving various different times he went to work. When asked what he was doing at the jeweler's, he said he was there to buy something for his girlfriend. When shown a photograph of the bracelet found at this home and

asked how he got it, Cruz said three men threatened to kill him if he did not buy the bracelet.

Up until this point in the interview, Caldas had not mentioned Montes to Cruz. Cruz encouraged Caldas to pursue the three men who had threatened him and then told Caldas that the bracelet belonged to a "dead guy," who was a friend of his.

When Caldas told Cruz he had spoken to his manager at work and that he had said Cruz did not work on February 14, Cruz told Caldas that the three men who had threatened him wanted him "to do that and he didn't want to." Caldas understood that to mean something involving Montes.

When Caldas asked Cruz what had happened at the motel, he denied having done anything. He then said that the three men threatened him if he said anything. Cruz said that it was these three men who had killed Montes and, although he had gone with them to the motel, he did not go to the police because they had threatened him as well. Cruz claimed he stayed outside the motel room and was not involved in Montes's death. Cruz denied driving Montes's vehicle, but then said one of the men gave him the keys to the car. He then acknowledged that he took the car and brought it back to Lamont and left it in a field. He broke the key because the three men told him to and threatened to kill him if he did not. According to Cruz, after the three men killed Montes, they gave him the chain, bracelet and ring.

Cruz then admitted to Caldas that he had not worked on February 14 and had not bought his girlfriend a rose. Cruz never mentioned that Montes was homosexual - it was Caldas who mentioned it to Cruz. It was Caldas who then asked Cruz if he had been attacked or threatened by Montes (Caldas explained on the stand that he was attempting to get Cruz to admit he was in the motel room). Cruz eventually began to tell Caldas that Montes had tried to touch him but did not elaborate further. He did not mention that Montes propositioned him or asked him for sex. Cruz told Caldas that he cut his finger

10.

on a "machine," and that the injury to his lip was caused by his girlfriend. Cruz answered the remainder of Caldas's questioning with "I don't remember" and "I don't know."

In a subsequent jail interview, after he had been booked, Cruz identified a photograph of Montes. When asked again about the three men, Cruz said that he met them on February 13, that they brainwashed him and offered him $1,500 to kill Montes. After he killed Montes, he was given the money. Cruz then changed his story again and said that the three men drugged him and he could not remember what happened. Caldas asked Cruz why he cleaned up the blood in the motel room. Cruz first said he did it because he was scared; he then immediately changed his story and said he did not clean up any blood. He said he struck Montes several times on the head with his fists and left him on the bed; he denied moving the body.

According to Caldas, Cruz's testimony earlier that morning at trial was the first time he had heard that version of the events.

*Rebuttal*

Sheriff's Deputy Steve Miller, who worked at the jail, testified that, on February 9, 2012, approximately three months before the current trial, he was notified that an inmate, Cruz, had six one- to two-inch fresh cuts on his chest.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

The jury convicted Cruz of second degree murder. Cruz makes numerous related arguments claiming insufficiency of the evidence to uphold his conviction. First, he contends we must reverse his conviction because there is sufficient evidence that he acted with justification in self-defense and without the use of excessive force, termed a "perfect self-defense." Second, he contends that we must reduce his conviction to voluntary manslaughter because the evidence was sufficient to prove that malice was negated by provocation or unreasonable self-defense, termed an "imperfect self-defense." We find no merit to his claims.

11.

*Standard of Review*

In determining whether there is sufficient evidence to support a conviction, "'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence - that is, evidence that is reasonable, credible, and of solid value - from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.'" (*Ibid.*) The jury, not the appellate court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*Id.* at pp. 507-508.) If the circumstances reasonably support the jury's finding of guilt beyond a reasonable doubt, we will not reverse even if we believe that we might reasonably reconcile the circumstances with a contrary finding. (*Id.* at p. 508.) We will affirm the conviction "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*Ibid.*)

*Applicable Law and Analysis*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) There are two degrees of murder. Willful, deliberate, and premeditated killings constitute first degree murder. (See § 189.) Second degree murder occurs when a person kills unlawfully and intentionally but does not form the intent to kill after premeditation and deliberation. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) Provocation may reduce first degree murder to second degree murder. (*People v. Thomas* (1945) 25 Cal.2d 880, 903-904.)

"[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; see also *People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be implied "'when a person does an act, the

12.

natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life .…'" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104; accord, *People v. Knoller, supra,* at p. 143.)

If the defendant commits an unlawful, intentional killing but lacks malice, he or she is guilty of the lesser-included offense of voluntary manslaughter. (§ 192; *People v. Barton* (1995) 12 Cal.4th 186, 199.) Two circumstances may negate malice and thus reduce murder to voluntary manslaughter: (1) when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or (2) when the defendant kills with an unreasonable but good faith belief in having to act in self-defense – an "imperfect self-defense." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116; *People v. Barton, supra,* at p. 199.)

A killing committed in "perfect self-defense" is neither murder not manslaughter, but is justifiable homicide. A justifiable homicide requires that the defendant honestly believe in the necessity of using force and that the belief be objectively reasonable. Also, the defendant must use no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505.)

A homicide is excused when committed by accident, if the defendant (1) acted in the heat of passion, (2) acted on sudden and sufficient provocation, (3) did not take undue advantage of the victim, (4) did not use a dangerous weapon, and (5) did not kill the victim in a cruel or unusual way. (CALCRIM No. 511; See § 195, subd. (2).)

The jury was properly instructed on all of the above theories of murder, malice, provocation, manslaughter, justifiable homicide and excusable homicide. (CALCRIM No. 500 (Homicide General Principles); CALCRIM Nos. 520 (Murder With Malice Aforethought), 521 (Murder: Degrees), 522 (Provocation: Effect on Degree of Murder), 570 (Voluntary Manslaughter: Heat of Passion - Lesser Included Offense), 571 (Voluntary Manslaughter: Imperfect Self-Defense), 505 (Justifiable Homicide based on

13.

Self-Defense), 511 (Excusable Homicide by Accident in the Heat of Passion), 3426 and 3428 (mental and voluntary intoxication defenses).

***Second Degree Murder***

First, we find there is sufficient evidence to support Cruz's conviction of second degree murder. A death caused by blows from hands and feet may be murder if the blows are accompanied by aggravating circumstances implying malice. (*People v. Cravens, supra,* 53 Cal.4th at p. 508; *People v. Munn* (1884) 65 Cal. 211, 212-213; *People v. Spring* (1984) 153 Cal.App.3d 1199, 1205; *People v. Zankich* (1961) 189 Cal.App.2d 54, 67; *People v. Teixeira* (1955) 136 Cal.App.2d 136, 150; *People v. Cayer* (1951) 102 Cal.App.2d 643, 648-649.) Among the circumstances courts have found relevant to determining whether malice is inferable in a particular case are the age and vulnerability of the victim, the number and size of the assailants, the ferocity and duration of the attack, the provocation for the attack, and the unusualness or unexpectedness of the victim's death. (See, e.g., *People v. Breland* (1966) 243 Cal.App.2d 644, 647-649, 653 [sufficient evidence to support second degree murder conviction where the defendant, without "considerable provocation," repeatedly hit and kicked a helpless victim in the head, chest, and stomach and the victim later died from a perforated bowel and related infection caused from blunt force abdominal trauma]; but see *People v. Munn, supra,* at pp. 211-212, 214 [malice not present where the defendant struck a grown boy two or three times with his fist and the blows did not produce an immediate serious effect, but later caused death].)

In *People v. Matta* (1976) 57 Cal.App.3d 472, the court found sufficient evidence of implied malice where the defendant inflicted repeated beatings on the victim, ultimately causing the victim's death. (*Id.* at p. 480.) The court found that the defendant's willful acts under circumstances where there was a strong likelihood that death or great bodily injury would result were sufficient to sustain a second degree murder conviction. (*Ibid.*)

14.

Here, the jury reasonably could have found the evidence sufficient to find that Cruz acted with implied malice, i.e., conscious disregard for human life or an abandoned and malignant heart. The evidence showed that the motel room had blood throughout – on the bed, floor, nightstand, walls and in the kitchenette. Despite Cruz's claim that Montes hit himself when he fell on the nightstand, Montes's body was severely beaten and he had been choked. Three of Montes's teeth were knocked out and his partial denture shoved into his throat. Cruz, who was much younger than Montes and who suffered only slight injuries, was able to flee the scene, taking with him Montes's jewelry and his car.

Because we find there is sufficient evidence to support the jury's finding of second degree murder, we will not reverse even if we believe that we might reasonably reconcile the circumstances with a contrary finding. (*People v. Cravens, supra,* 53 Cal.4th at p. 508.) We will affirm the conviction "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."'" [Citaiton.]" (*Ibid.*) We address Cruz's contentions only because he argues he has established his claims as a matter of law.

### Justifiable Homicide

In his argument that his conviction must be reversed because his actions constituted self-defense without use of excessive force (a perfect self-defense), Cruz relies heavily on *People v. Collins* (1961) 189 Cal.App.2d 575 (*Collins*). In *Collins,* the defendant was found guilty of voluntary manslaughter for killing Raymond Whiteside. On appeal, the defendant contended that there was insufficient evidence of manslaughter and that the evidence instead established a justifiable homicide under section 197. The defendant had had sexual relations with Whiteside on two prior occasions. On the occasion of the death, the defendant went to Whiteside's hotel room on the promise of something to eat. Once in the room, Whiteside, who was much bigger than the defendant, took off his clothing, grabbed the defendant and attempted to sodomize him.

15.

The defendant got frightened and hit Whiteside in the face five or six times with a bottle. When Whiteside quit struggling, the defendant left the room. The blows to Whiteside killed him. (*Id.* at pp. 578-579.) The appellate court concluded that justifiable homicide was established as a matter of law. (*Id.* at p. 588.)

While there are many superficial similarities between *Collins* and the case here, there are some substantial differences: the defendant in *Collins* gave his name and address to the hotel clerk, he returned to the hotel to tell Whiteside he was sorry that he hit him; he did not rob the deceased, and he did not malinger when tested. In addition, other than initially claiming he did not have a fight with Whiteside, the defendant's further interviews with officers were consistent. (*Collins, supra,* 189 Cal.App.2d at pp. 580-587.) This is in sharp contrast to Cruz, who admitted that he "provided about ten or twelve different versions or sequences of events." In addition, the injuries inflicted by Cruz on Montes were more severe than those inflicted by the defendant in *Collins* on Whiteside, and, unlike *Collins*, Cruz lied about the condition he left his victim in. (*Ibid.*) We also note that Cruz suffered very little injury during the melee. In light of the totality of the circumstances, even if Montes's threats initially justified the use of force in response, the force became unreasonable and Cruz's need for self-defense did not exist throughout the duration of the struggle. We do not find as a matter of law that Cruz's actions amounted to justifiable homicide.

### Voluntary Manslaughter

Cruz also argues that there was insufficient evidence to support his second degree murder conviction because the evidence shows he acted in unreasonable or imperfect self-defense or heat of passion, necessitating a voluntary manslaughter conviction. When a defendant kills in unreasonable or imperfect self-defense or heat of passion sufficient to support a voluntary manslaughter finding, the malice that is required to establish murder is presumptively absent. (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) When charged with murder, if there is evidence sufficient to show that the defendant was

16.

acting in self-defense or provoked to action upon a sudden quarrel or heat of passion, it is the prosecution, not the defense, that must prove beyond a reasonable doubt that these circumstances were lacking in order to establish the murder element of malice. (*People v. Rios* (2000) 23 Cal.4th 450, 462-463.)

Voluntary manslaughter under an imperfect self-defense requires that the defendant acted in actual, but unreasonable, fear of imminent harm, which can include great bodily injury or rape. (*People v. Stitely* (2005) 35 Cal.4th 514, 552; CALCRIM No. 571.) Fear of future harm will not suffice; the defendant's fear must be of imminent danger to life or great bodily injury. (*People v. Stitely, supra,* at p. 551.)

An intentional unlawful homicide is voluntary manslaughter upon a sudden quarrel or heat of passion if the defendant acted through strong passion rather than judgment, aroused by a provocation sufficient to cause an ordinary person to act rashly or without due deliberation and reflection. (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) No specific type of provocation is required, and the passion aroused can be any ""''[v]iolent, intense, high-wrought or enthusiastic emotion'''"" other than revenge. (*Ibid.*) "Thus, a person who *intentionally* kills as a result of provocation, that is, 'upon a sudden quarrel or heat of passion,' lacks malice and is guilty not of murder but of the lesser offense of voluntary manslaughter." (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

The heat of passion requirement for manslaughter has both an objective and a subjective component. In order to fulfill the subjective requirement, the defendant must actually kill under the heat of passion. But the circumstances giving rise to the heat of passion are also viewed objectively. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) In order to negate malice and to show voluntary manslaughter, the provocation of the defendant to act in the heat of passion cannot be trivial. The circumstances giving rise to his conduct must be objectively sufficient to provoke an ordinarily reasonable person to act rashly and without deliberation, from passion rather than judgment. (*People v. Cruz, supra,* 44 Cal.4th at p. 664.)

17.

Moreover, the defendant cannot have been the source of that provocation; it must be the victim who initiated the provocation that incites the defendant to homicidal conduct in the heat of passion. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Nevertheless, no specific type of provocation is required in order to satisfy this test; verbal provocation may be sufficient. (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, overruled on another point in *People v. Barton, supra,* 12 Cal.4th at p. 201; *People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

Clearly, there was evidence from which a reasonable jury could conclude that Cruz acted in unreasonable self-defense and/or in the heat of passion or on a sudden quarrel. Cruz testified that he was provoked by Montes's proposition that he have sex with him and that he attacked Montes to protect himself from being raped. The jury received instructions on these points. But the jury certainly did not have to accept Cruz's version of the facts, or to draw all possible inferences in Cruz's favor. And, as we found earlier, there is sufficient evidence to find that Cruz acted with malice when he beat Montes repeatedly. We do not find that Cruz was guilty of voluntary manslaughter as a matter of law.

### Conclusion

If a defendant fails to present us with all the relevant evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores. Such is the case here. Like many defendants appealing their convictions, Cruz pays lip service to the substantial evidence standard of review, but then disregards that standard by ignoring evidence which supports the jury's conclusion that he acted with malice, with excessive force not negated in self-defense and not in unreasonable self-defense or in the heat of passion when he beat Montes to death. His claim to the contrary is rejected.

## II. EXPERT TESTIMONY

18.

Cruz next argues that the trial court abused its discretion and violated his Fourteenth Amendment right to due process of law when it allowed Dr. Enstice to opine that Montes's death was a homicide and not an accident. We disagree.

***Procedural Background***

Prior to trial, counsel for Cruz moved the court for an order in limine to exclude Dr. Enstice's testimony as to the manner of death being a homicide and not an accident since the jury did not need an expert opinion to decide that issue. Dr Enstice is the forensic pathologist who performed the autopsy on Montes. Counsel also requested exclusion under Evidence Code section 352, on grounds that the opinion on the ultimate issue was unduly prejudicial and would tend to confuse the jury on the issue of how the fatal injuries were sustained. Counsel argued that, although Dr. Enstice could testify that there was evidence of partial strangulation and that the cause of death was trauma to the head, she should not be permitted to testify that the manner of these injuries was at the hands of another as opposed to an accident.

The prosecutor countered that, in his experience, the medical examiner always testified as to the manner of death, whether it was a homicide, suicide, accident, or from natural causes, citing the Government Code which requires a medical examiner to make a determination as to the cause of death. As argued by the prosecutor, the manner of death was a medical issue, while the only legal issue was the identity of the killer. The prosecutor further argued that the manner of death as homicide was relevant and probative on the issues the People were required to prove, namely absence of self-defense and presence of malice.

Counsel for Cruz argued that, although a medical examiner may be required to make a determination as to the manner of death, it did not follow that this information must be presented to the jury.

The trial court ruled that, not only could Dr. Enstice testify to the cause of death being blunt force trauma and partial strangulation, she should also be allowed to

19.

differentiate between homicide, suicide, accident and natural death. The trial court denied Cruz's motion, ruling the expert's opinion was admissible.

At trial, Dr. Enstice explained that her duties included a determination on the cause of death; that accidental death included death from vehicle crashes, drowning, and "people crossing streets"; and that a homicide means "someone dies at the hands of another" from "shooting, beating, stabbing, [or] strangulation .…" She clarified this was a forensic definition, as opposed to a legal finding. Dr. Enstice opined that the dent in the nightstand was insufficient to explain all of Montes's injuries, and that Montes likely did not sustain those injuries by falling on his own. Based on an examination of Montes's body, accident and suicide were ruled out as a manner of death, and Dr. Entice concluded the death was a homicide. Counsel for Cruz cross-examined Dr. Enstice extensively, but did not question her about her homicide statement.

### Applicable Law and Analysis

Trial courts are vested with broad discretion in ruling on the admissibility of expert testimony, and we review their rulings for abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 946; *People v. McDowell* (2012) 54 Cal.4th 395, 426.) Applying this standard here, we find no abuse of discretion.

Evidence Code section 801 provides:

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (See, i.e., *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088.)

Even though "it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case. Evidence Code section 805 provides that '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1227 [finding no error in the admission of a crime scene expert witness's testimony that the same person had committed six murders despite the defendant's objection that the testimony invaded the province of the jury and concerned the ultimate issue of guilt or innocence].)

We conclude Dr. Enstice's testimony did not impermissibly invade the province of the jury.

Even if Dr. Enstice's testimony was erroneously admitted, Cruz has failed to show it was reasonably likely he would have received a more favorable result in the absence of the error. (*People v. Prieto* (2003) 30 Cal.4th 226, 247; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The jury was instructed pursuant to CALCRIM No. 500 that:

"Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. [¶] The defendant is charged with murder. [¶] Manslaughter is a lesser offense to murder. [¶] A homicide can be lawful or unlawful. If a person kills with a legally valid [excuse] or justification, the killing is lawful and he or she has not committed a crime. [¶] If there is no legal[ly] valid [excuse] or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. [¶] You must decide whether the killing in this case was unlawful, and if so, what specific crime was committed. [¶] I will now instruct you in more detail on what is [a] legally permissible excuse of justification for homicide. [¶] I will also instruct you on the [different] types of murder and manslaughter."

As noted earlier, proper instructions on murder, manslaughter, and justifiable homicide were then given. In addition, the trial court instructed the jury under CALCRIM No. 226, that the jurors were the ultimate judges of credibility, and under CALCRIM No. 332, that

21.

they were free to accord an expert witness's opinion the weight it deserved after considering the bases for the opinion. We presume the jury understood and followed those instructions in the absence of a showing to the contrary. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1327-1328.)

## III. INSTRUCTION ON INVOLUNTARY MANSLAUGHTER

Cruz finally contends that the trial court erred when it denied his request for jury instruction on involuntary manslaughter, violating his Sixth and Fourteenth Amendment rights. Cruz argues that a jury instructed on involuntary manslaughter could have concluded that, based on his mental disease, defect or disorder exacerbated by ingestion of alcohol and drugs, he did not harbor malice, either express or implied, leading necessarily to a verdict of involuntary manslaughter. We find no prejudicial error.

### *Procedural Background*

At trial, Cruz requested that the jury be instructed pursuant to CALCRIM No. 580 on involuntary manslaughter, which states in part:

> "When a person commits an unlawful killing but does not intent to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter."

Counsel for Cruz requested the instruction, arguing that Cruz did not intent to kill anyone, but was only acting in self-defense. Counsel emphasized Cruz's lack of intent as evidenced by his "mental defects" or "mental impairments," alcohol and drugs. The prosecutor objected, arguing the evidence, was "clearly indicative of an indifference to human life." The prosecutor also noted that defenses involving voluntary intoxication

22.

and mental defenses were already being given.[4]  The trial court denied Cruz's request, finding there was no evidence to support the statutory elements of involuntary manslaughter or that Cruz lacked malice.

*Applicable Law and Analysis*

"'"[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence[, and] … an erroneous failure to instruct on a lesser included offense constitutes a denial of that right .…"  [Citations.]  To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.…'"  (*People v. Heard* (2003) 31 Cal.4th 946, 980-981.)  The court is not obligated, however, to instruct on a lesser offense that has no substantial evidentiary support.  Substantial evidence in this context is evidence from which a reasonable jury could find that the lesser offense, but not the greater, was committed.  When evaluating the evidence for this purpose, the court determines its bare legal sufficiency, but not its weight.  (*People v. Breverman, supra,* 19 Cal.4th at p. 177.)

---

**4**    The jury was instructed on voluntary intoxication pursuant to CALCRIM No. 3426, as follows:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only [in] deciding whether the defendant acted with a specific intent or mental state required of each crime and allegation.  [¶]  A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drink, drug, or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶]…[¶]  You may not consider evidence of voluntary intoxication for any other purpose."  They were instructed pursuant to CALCRIM No. 3428, in relevant part:  "You have heard evidence that the defendant may have suffered from a mental disease, or defect or disorder.  [¶]  You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime."

With this standard in mind, we first review the elements of involuntary manslaughter. Section 192, subdivision (b) defines involuntary manslaughter as "the unlawful killing of a human being without malice" through "the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." The California Supreme Court has held that "[i]nvoluntary manslaughter ordinarily is considered a lesser included offense of murder" and that it "includes criminally negligent homicide." (*People v. Heard, supra,* 31 Cal.4th at p. 981.)

In *People v. Butler* (2010) 187 Cal.App.4th 998, 1008, the court distinguished criminal negligence in the context of involuntary manslaughter from implied malice in the context of murder:

> "Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. [Citations.] Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk."

(See also *People v. Cleaves* (1991) 229 Cal.App.3d 367, 378 ["[I]f the defendant commits an act which endangers human life without realizing the risk involved, he is guilty of [involuntary] manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice."].)

Here, there is no dispute that a reasonable person would have been aware of the risk to Montes's life caused by Cruz's attack on Montes. Thus, regardless of Cruz's actual, subjective awareness of the risk he posed to Montes's life, the objective, criminal negligence standard required for involuntary manslaughter was easily satisfied. The issue is whether there is substantial evidence that Cruz did not have the subjective mental state required for murder - either the intent to kill (express malice) or a conscious disregard for

24.

life (implied malice).  If so, the court was required to instruct the jury as to involuntary manslaughter.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 884.)

Evidence of a mental disease, mental defect, or mental disorder is admissible on the issue of whether an accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought.  (§ 28, subd. (a).)[5]  Thus, a "verdict of involuntary manslaughter is warranted where the defendant demonstrates 'that because of his mental illness … he did not *in fact* form the intent unlawfully to kill (i.e., did not have the malice aforethought).'  [Citation.]  An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill."  (*People v. Rogers, supra,* 39 Cal.4th at p. 884, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1117.)

Here, evidence of Cruz's mental impairment came in via the expert testimony of Dr. Chiles who diagnosed Cruz with borderline intellectual functioning as part of dementia.  Dr. Chiles opined that Cruz's dementia was secondary to his drug use, especially inhaling glue.  Dr. Chiles described dementia as "a development of multiple cognitive deficits that include - in other words, problems in your brain - the ability to use your brain as a whole … strong motor function here.  That includes poor memory, that includes what we call aphasia, the inability to use language well and understand language and produce language.  It encompasses difficulty with executive functional skills, which are our higher level thinking, and an ability to plan, initiate, monitor, rate, in other words, guide and stop complex behavior."

---

**5**      Whether the accused actually formed the required mental state is to be distinguished from diminished capacity.  "While the Legislature, in eliminating the diminished capacity defense, 'precluded jury consideration of mental disease, defect, or disorder as evidence of a defendant's *capacity* to form a requisite criminal intent, … it did not preclude jury consideration of mental condition in deciding whether a defendant *actually* formed the requisite intent.'  [Citations.]"  (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1450.)

Dr. Chiles stated that Cruz also had a psychosis, which caused him not to concentrate or pay attention. Cruz reported hearing voices. In Dr. Chiles' opinion, Cruz, did not have "good impulse control," and he did not have the ability to "process information very well, … especially when he's intoxicated," causing him to become "more impaired." According to Dr. Chiles, Cruz had "consumed so many drugs so chronically so that his brain is already showing permanent damage." Dr. Chiles did acknowledge that four other doctors found Cruz was malingering, and she herself diagnosed him "with malingering in partial remission."

Assuming Dr. Chiles's testimony amounted to substantial evidence that Cruz had a mental defect sufficient to warrant an instruction on involuntary manslaughter, the erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson, supra,* 46 Cal.2d 818. (*People v. Rogers, supra,* 39 Cal.4th at pp. 867-868; *People v. Breverman, supra,* 19 Cal.4th at pp. 177-178.) "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman, supra,* at p. 177.)

Here, the relevant evidence for this question is evidence supporting or negating the elements of malice; that is, evidence bearing on the issues of whether Cruz acted with knowledge that his conduct endangered the life of another and with conscious disregard for life. Even assuming Dr. Chiles's testimony that Cruz had a mental defect was sufficient to warrant an instruction on involuntary manslaughter, when viewed in the context of the entire record, such evidence is comparatively weak, and the evidence of malice relatively strong.

As we discussed previously, the strongest evidence supporting the existence of malice are the facts surrounding the incident. Cruz willingly went with Montes to the motel. Although Cruz claimed he drank several beers and ingested "white powder" while there, he did not claim he was in any sort of drug or alcohol induced haze. Once at the motel room, Cruz repeatedly beat Montes viciously and forcefully, while he himself suffered very little injury. When he rendered Montes helpless, Cruz dumped his body in the shower, and took jewelry and car keys from him and fled the scene in Montes's vehicle.

These actions are strong evidence that Cruz acted with knowledge that his conduct endangered the life of Montes and that he harbored a conscious disregard for life.

We also find any error in failing to instruct on involuntary manslaughter harmless because, in addition to being fully instructed on second degree murder, the jury was also instructed on heat of passion and imperfect self-defense voluntary manslaughter, both of which require a lesser degree of culpability than second degree murder but a higher degree of culpability than does the offense of involuntary manslaughter. The jury rejected the lesser options and found Cruz guilty of second degree murder. Under these circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option.

## DISPOSITION

The judgment is affirmed.

_____
Franson, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Kane, J.